**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VOYAGEUR OUTWARD BOUND SCHOOL<br>1007 Spruce Road<br>Ely, MN 55731<br><br>PIRAGIS NORTHWOODS COMPANY, INC.<br>105 N Central Avenue<br>Ely, MN 55731-1210<br><br>ELY OUTFITTING COMPANY &<br>BOUNDARY WATERS GUIDE SERVICE<br>529 East Sheridan Street<br>Ely, MN 55731<br><br>WENONAH CANOE, INC.<br>1252 Bundy Blvd<br>Winona, MN 55987-4872<br><br>NORTHSTAR CANOE<br>1506 14th Street S<br>Princeton, MN 55371-2317<br><br>SAWBILL CANOE OUTFITTERS, INC.<br>4620 Sawbill Trail<br>Tofte, MN 55615<br><br>HUNGRY JACK OUTFITTERS<br>318 S Hungry Jack Road<br>Grand Marais, MN 55604<br><br>WOMEN'S WILDERNESS DISCOVERY<br>429 East Sheridan Street<br>Ely, MN 55731<br><br>RIVER POINT RESORT AND OUTFITTING<br>COMPANY<br>PO Box 397<br>Ely, MN 55731-0397 | Case No. _____ |

NORTHEASTERN MINNESOTANS FOR
WILDERNESS
PO Box 625
Ely, MN 55731

                     *Plaintiffs*,

    v.

UNITED STATES OF AMERICA

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240

RYAN ZINKE, in his official capacity as
Secretary of the Interior
1849 C Street NW
Washington, DC 20240

BUREAU OF LAND MANAGEMENT,
1849 C Street NW
Washington, DC 20240

BRIAN STEED, in his official capacity as the
official exercising the authority of the Director of
the Bureau of Land Management
1849 C Street NW
Washington, DC 20240

                     *Defendants*.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

2

**INTRODUCTION**

1.      Plaintiffs seek declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, against the United States, the U.S. Department of the Interior ("Interior"), the Secretary of the Interior, the Bureau of Land Management ("BLM"), and the Acting Director of the BLM to declare that their reinstatement of two mining leases exceeds their authority under law and is arbitrary and capricious, and to enjoin them from further consideration of applications to renew the two leases.

2.      This case challenges the Defendants' unlawful decision to reinstate two expired mining leases in the Superior National Forest adjacent to the Boundary Waters Canoe Area Wilderness ("BWCAW" or "Wilderness") in northern Minnesota.

3.      The BWCAW is a pristine, water-based wilderness protected by federal law.  The lessee plans to construct a copper-nickel sulfide-ore mine on parts of the leased areas.  Sulfide-ore mining causes acid mine-drainage when sulfide minerals present in ore bodies and rock overburden are exposed to air and water.  Mining and mining-related activities on the leased land would be likely to cause severe and irreparable harm to the BWCAW and the Plaintiffs.

4.      The BLM lawfully and properly rejected the applications for renewal of the two mining leases in 2016 after the United States Forest Service ("Forest Service"), which is invested by statute with the authority to consent (or to withhold consent) to the development of minerals owned by the United States in the Superior National Forest, found "unacceptable the inherent potential risk that development of a regionally-untested copper-nickel sulfide ore mine within the same watershed as the BWCAW might cause serious and irreplaceable harm to this unique, iconic, and irreplaceable wilderness area."  Ex. 1.  The leases expired in December 2016 as a result of the BLM's decision to deny the renewal request.

5.      Nearly 16 months after the leases' expiration, the BLM purported to reinstate them based on a dubious claim that the decision to reject the renewal application was based on a legal error.  According to Defendants, Interior and the BLM are bound to renew the leases regardless of the Forest Service's objection and its statutory right to disapprove mineral-leasing decisions in the Superior National Forest.

6.      The BLM's decision to correct this purported legal error is without authority and comes well after any reasonable period for correcting errors.  It is also arbitrary and capricious because the claimed legal error does not exist.  In fact, the decision to reject the lease-renewal application was supported by a reasoned opinion of the Solicitor of the Department of the Interior that considered and soundly rejected the flawed arguments that the BLM and Interior are now advancing.  It was also supported by the Forest Service's determination that sulfide-ore mining adjacent to the BWCAW posed grave dangers to its precious water-based ecosystem.

7.      Plaintiffs are business owners and users of the Wilderness and Superior National Forest.  Their businesses and other uses of the Wilderness depend on the BWCAW remaining in its undiminished, pure state, and on the Superior National Forest remaining a welcoming place for tourists and recreational users.

8.      Defendants' unlawful action has the effect of allowing the lessee, Franconia Minerals (US) LLC ("Franconia"), to continue mining development-related activities in pursuit of a dangerous sulfide-ore mine adjacent to the BWCAW.  The operation and development of the mine, including the activities leading to Franconia's submission of a mine plan, are already harming and will continue to harm Plaintiffs' livelihoods and enjoyment of the Wilderness and Superior National Forest.  It is precisely these activities that the Chief of the Forest Service found to pose an unacceptable risk to the pristine, water-based wilderness found in the BWCAW.

This Court should declare the Defendants' action unlawful and enjoin them from further pursuing courses of action that threaten the integrity of the Wilderness and those who depend on it.

## JURISDICTION AND VENUE

9.     The Court has subject-matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1361, as well as 5 U.S.C. § 702.

10.     The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and its inherent authority.  Injunctive relief is also authorized by 5 U.S.C. § 706.

11.     Venue is proper under 28 U.S.C. § 1391(b) and (e) because all Defendants reside in this judicial district.  Additionally, the events giving rise to the action challenged here, including the decision to reinstate the two leases and the lease-renewal application, took place in this judicial district.

## PLAINTIFFS

12.     Plaintiff VOYAGEUR OUTWARD BOUND SCHOOL ("VOBS") is a nonprofit organization that focuses on leadership and outdoor experiential education through multi-week outdoor and wilderness expeditions.  Since 1964, VOBS's basecamp has been located in Ely, Minnesota within the Superior National Forest, along the South Kawishiwi River adjacent to the BWCAW.  VOBS expeditions bring more than 600 people a year into the BWCAW.  VOBS employs approximately 25 people year round, all of whom live in and around Ely, Minnesota, and it employs an additional 75 people in Ely during the summer months.  VOBS expeditions cater to a wide range of people, including but not limited to military veterans, young people struggling to make positive choices, adults undergoing major life changes, families, and college

students.  The pristine wilderness setting provided by the BWCAW is a critical aspect of the VOBS expeditions.

13.     Plaintiff PIRAGIS NORTHWOODS COMPANY, INC. ("Piragis Northwoods") is a canoe-trip outfitting and guide business located in Ely, Minnesota.  Founded in 1979 to serve the needs of wilderness canoe paddlers visiting the BWCAW and the outdoor needs of the local population, Piragis Northwoods currently employs 18 full-time, year-round staff.  In the peak summer months, that number increases to 55 employees.  Piragis Northwoods' payroll exceeds $1 million.

14.     Plaintiff ELY OUTFITTING COMPANY & BOUNDARY WATERS GUIDE SERVICE ("Ely Outfitting") is a professional guide and outfitting service based in Ely, Minnesota and founded in 2008 primarily to service the needs of customers and clients around the nation who travel to and explore the BWCAW.  A significant percentage of Ely Outfitting's customers enter the BWCAW through the South Kawishiwi River, Gabbro Lake, Snake River, Isabella River, Farm Lake, Lake One, and Fall Lake entry points.  These entry points, located in and around Ely and the Kawishiwi Triangle, are popular with first-time paddlers because they offer excellent wilderness and outdoor recreation characteristics with comparatively easy access.

15.     Plaintiff WENONAH CANOE, INC. ("Wenonah Canoe") is an independent, family-owned corporation that is one of the largest manufacturers of Kevlar canoes in the world. Founded in the early 1970s in Winona, Minnesota, Wenonah Canoe now employs nearly 100 people and produces more than 4,000 canoes and kayaks per year.  Wenonah Canoe has many customers who frequent the BWCAW area, and 25 percent of its canoes are sold in Minnesota.

16.     Plaintiff NORTHSTAR CANOES is a canoe-manufacturing business located in Princeton, Minnesota.  Founded in 2014, Northstar Canoes manufactures canoes and sells them

dc-929367

directly to outfitters and retailers.  Northstar Canoes sells around 200 canoes each year to outfitters, most of which are located in or near the BWCAW and in the Midwest.  The company employs, off and on, about 20 full-time or part-time people.  Northstar Canoes' business depends largely on the BWCAW—so much so that it focuses about 90 percent of its advertising on the BWCAW area.

17.     Plaintiff SAWBILL CANOE OUTFITTERS, INC. ("Sawbill") is a family-owned canoe outfitting business located in a remote location on the Sawbill Trail north of Tofte, Minnesota with no telephone or power lines.  Sawbill provides outfitting services to clients entering the BWCAW.  In addition to operating an outfitting shop and store, Sawbill issues BWCAW entry permits and also operates as the concessionaire for three Forest Service campgrounds, one of which is located onsite.  Sawbill's customers rely on its outfitting services and campground both before and after their trips.  Many customers also choose to stay onsite at the campground and complete day-trips into the BWCAW.  Sawbill relies exclusively on visitors to the BWCAW to sustain its customer base.  On average, Sawbill employs 15 full-time employees from May to October.  Sawbill customers come from all across the United States and from a number of foreign countries.

18.     Plaintiff HUNGRY JACK OUTFITTERS ("Hungry Jack") is a family-owned accommodation and camping-outfitting business located on the Gunflint Trail north of Grand Marais, Minnesota.  Founded in 1983, Hungry Jack is primarily a rental operation that provides canoes, camping gear, food, and overnight accommodations for people who want to experience the Wilderness.  Hungry Jack's clients and customers come from all across the globe, and from a wide range of socio-economic backgrounds, to visit the BWCAW and surrounding areas.

19.     Plaintiff WOMEN'S WILDERNESS DISCOVERY, LLC ("Women's Wilderness Discovery") was founded in March 2014 as the only female-owned, female-packed, female-guided professional outfitting and guide business in Ely, Minnesota.  Women's Wilderness Discovery provides year-round, fully outfitted, and guided BWCAW canoe camping, hike camping, canoe and kayak treks, day hikes, and winter camping treks catered principally to women.  Women's Wilderness Discovery seeks to provide a safe, positive model for women and girls to enrich their lives through the wilderness experience and outdoor adventure, with clients coming from Minnesota and many other states, as well as from a few foreign nations.

20.     Plaintiff RIVER POINT RESORT AND OUTFITTING COMPANY ("River Point") is a tourism and hospitality business located in Ely, Minnesota that has been in operation since 1944.  Owned and operated continually by the Koschak family since its founding, River Point offers lodging in the form of 16 housekeeping cabins, villas, and chalets, along with auxiliary recreational opportunities such as swimming, boating, kayaking and canoeing, guided fishing, hiking and other family activities.  River Point accommodates approximately 2,000 housekeeping guests per season, which runs from mid-May through mid-October.  As a complement to its lodging and accommodations, River Point also outfits trips in the BWCAW. River Point's outfitting business includes more than 100 canoes, and it outfits more than 775 people traveling in the BWCAW in the course of a summer.  River Point offers both partial and complete outfitting services, which can include meals, routing, maps and permits, and transportation to any of the approximately 30 entry points into the BWCAW in the Ely area.

21.     River Point's property consists of 34 acres, with one mile of shoreline, in the heart of the Superior National Forest.  Prior to construction of the resort, the land had been unoccupied and undeveloped since the time of the Laurel Indians, who lived there about 500 years before the

Common Era.  The land includes a significant archeological site that was discovered in 1982, the

first discovery of a site occupied by the Laurel Indians in the United States.  An archeological

covenant with the Forest Service protects this site on the south shoreline.  The BWCAW lies five

river miles to the northeast of the River Point resort property and is accessible from the River

Point property by canoe through Entry Point 32 (South Kawishiwi River).  Most River Point

customers and clients are attracted to River Point's location on the edge of the BWCAW, the

area's natural beauty, the clean air, the quiet, and the wilderness setting.

22.     Plaintiff NORTHEASTERN MINNESOTANS FOR WILDERNESS ("NMW") is

a nonprofit, tax-exempt, charitable corporation organized under the laws of Minnesota.  Formed

in 1996 and based in Ely, Minnesota, NMW's mission is to protect and preserve wilderness and

wild places in Minnesota's Arrowhead region, to advocate for the protection of the BWCAW

and Voyageurs National Park and the enhancement of their wilderness aspect, and to foster

education about the value of wilderness and wild places.  NMW was formed to continue the local

tradition of working to protect wild places, particularly the BWCAW, against increasing

commercial pressures so that the area's natural features and processes remain intact for future

generations.

23.     NMW has approximately 13,000 members, all of whom have contributed

financially, and more than 133,000 additional supporters across all 50 states.  NMW's members

rely on, appreciate, and benefit from the natural resources in the Superior National Forest,

especially the waters, lands, plant communities, and wildlife in the BWCAW, as well as in

Voyageurs National Park.  They have a long-standing interest in lynx, moose, wolf, and forest

conservation, both in the BWCAW and across the Superior National Forest.

24. NMW members and staff regularly visit the BWCAW, Voyageurs National Park, the Superior National Forest, and surrounding areas for recreation, wildlife observation, and other uses. Many NMW members plan to visit the BWCAW over the coming days, weeks, months, and years.

## DEFENDANTS

25. Defendant UNITED STATES owns the mineral interests covered by the leases.

26. Defendant UNITED STATES DEPARTMENT OF THE INTERIOR is responsible for the management of certain federal mineral interests, including the mineral interests covered by the leases.

27. Defendant RYAN ZINKE is sued in his official capacity as the Secretary of the Interior of the United States.

28. Secretary Zinke is responsible for ensuring that the Department of the Interior and its constituent agencies, including the BLM, comply with the applicable law, including with respect to the decision to reinstate the mining leases and lease-renewal application as described below.

29. The Secretary of the Interior resides and conducts his duties in Washington, D.C.

30. Defendant BLM is an administrative agency within the U.S. Department of the Interior. It has been delegated authority by the Secretary of the Interior to administer the development and utilization of certain mineral interests owned by the United States, including the mineral interests covered by the leases.

31. Defendant BRIAN STEED is sued in his official capacity as the official exercising the authority of the Director of the BLM within the U.S. Department of the Interior.

dc-929367

32.     The Director of the BLM (and currently, Mr. Steed) is responsible for ensuring that the BLM complies with the applicable law, including with respect to the decision to reinstate the mining leases and lease-renewal application as described below.

33.     The Director of the BLM (and currently, Mr. Steed) resides and conducts his duties in Washington, D.C.

## BACKGROUND

### *The Boundary Waters Canoe Area Wilderness and the Superior National Forest*

34.     The BWCAW is a 1.1 million-acre, federally protected wilderness situated in northern Minnesota, extending nearly 200 miles along the border with Canada.  It constitutes the northern third of the Superior National Forest.  Northwest of the BWCAW is Voyageurs National Park.

35.     The BWCAW is a water-based wilderness.  It includes approximately 1,750 pristine lakes ranging in size from 10 acres to 10,000 acres, and has more than 1,200 miles of canoe routes.  Together with the rest of the Superior National Forest, it holds 20 percent of the entire National Forest System's fresh water supply.  The extremely high water quality of the BWCAW is critical to maintaining the wilderness ecosystem.

36.     The Superior National Forest ("Forest") provides abundant and diverse habitats for thousands of species.  The Forest has many popular game species of fish, birds and mammals.  It is also home to three threatened or endangered species: the Canada lynx, northern long-eared bat, and gray wolf.  Indeed, it has one of largest populations of gray wolves outside Alaska.

37.     The BWCAW is the most visited wilderness area in the entire National Wilderness Preservation System.  In addition to hiking, fishing and camping, summer visitors are

able to travel long distances by non-motorized watercraft through the thousands of lake and

stream canoe routes.  In the winter, visitors enjoy snowshoeing, skiing, dog-sledding, camping

and ice-fishing.

38.     In 1926, the Department of Agriculture first set aside some of the area that now

constitutes the BWCAW.  The Wilderness Act of 1964 designated land in what is now the

BWCAW as a wilderness.  The Boundary Waters Canoe Area Wilderness Act of 1978 expanded

the Wilderness to its current size and also established a BWCAW Mining Protection Area

("MPA") around the edges of the Wilderness.

39.     The Boundary Waters Canoe Area Wilderness Act of 1978 states that its purposes

are to:  "(1) provide for the protection and management of the fish and wildlife of the wilderness

so as to enhance public enjoyment and appreciation of the unique biotic resources of the region,

(2) protect and enhance the natural values and environmental quality of the lakes, streams,

shorelines and associated forest areas of the wilderness, (3) maintain high water quality in such

areas, (4) minimize to the maximum extent possible, the environmental impacts associated with

mineral development affecting such areas, (5) prevent further road and commercial development

and restore natural conditions to existing temporary roads in the wilderness, and (6) provide for

the orderly and equitable transition from motorized recreational uses to nonmotorized

recreational use on those lakes, streams, and portages in the wilderness where such mechanized

uses are to be phased out under the provisions of this Act."  Pub. L. 95–495, § 2, Oct. 21, 1978,

92 Stat. 1649.

40.     The Boundary Waters Canoe Area Wilderness Act of 1978 not only prohibits the

United States from issuing any permit, lease, or other authorization for "exploration for, or

mining of, minerals owned by the United States within the Boundary Waters Canoe Area

Wilderness and Boundary Waters Canoe Area Mining Protection Area" and "exploration for, or mining of minerals within such areas if such activities may affect navigable waters," it also prohibits "the use of property owned by the United States in relation to any mining of or exploration for minerals in such areas which may materially impair the wilderness qualities of the wilderness area or which may materially impair the natural values and environmental quality of the mining protection area."   Pub. L. 95–495, § 11(a), Oct. 21, 1978, 92 Stat. 1649.

41.     The Boundary Waters Canoe Area Wilderness Act of 1978 therefore protects Plaintiffs' interests in using the BWCAW for recreational and business purposes, as well as their interests in preserving the BWCAW as a natural and undiminished environment and protecting against the environmental impacts associated with mineral development affecting the BWCAW.

42.     In areas of the Superior National Forest outside the BWCAW and MPA, the Secretary of the Interior is authorized to grant or renew mineral leases and prospecting permits for federally owned minerals only if the Secretary of Agriculture consents to such mineral development.  16 U.S.C. §§ 508b and 520; 43 C.F.R. §§ 3503.13(c) and 3503.20.  Through this statute, the BWCAW, MPA and Superior National Forest are afforded greater protection from the dangers of mining.  This statute protects Plaintiffs' interests in using the Superior National Forest and BWCAW for recreational and business purposes against the environmental impacts associated with mineral development affecting the Superior National Forest and BWCAW.

### Issuance and Two Renewals of Leases MNES 01352 and 01353

43.     The United States, through the BLM, issued two hardrock mineral leases, MNES

01352 and MNES 01353 (the "Leases"), to the International Nickel Company ("INCO") on

June 1, 1966.  Ex. 2.

44.     The 1966 Leases conveyed "the exclusive right to mine, remove, and dispose of

all the copper and/or nickel minerals and associated minerals" within certain lands located in the

Superior National Forest south of the BWCAW in the State of Minnesota.  Ex. 2.  The land

leased under MNES 01352 is located directly adjacent to the BWCAW, and MNES 01353 is

located within three miles of the BWCAW.

45.     The lands covered by the Leases are shown in relation to the BWCAW in the map

below:



46.     The leased areas contain a mixture of lands reserved from the public domain and acquired lands.  The vast majority are public-domain lands.

47.     The 1966 Leases stated in Section 1(a) that they were "for a period of twenty (20) years with a right in the Lessee to renew the same for successive periods of ten (10) years each in accordance with regulation 43 C.F.R. § 3221.4(f) and the provisions of this lease."  Ex. 2.

Section 5 of the 1966 Leases, entitled Renewal Terms, provided detailed limits and conditions on the renewals.  *Id*.

48.     INCO requested renewal of the leases in 1986.

49.     On June 8, 1986, the BLM requested that the Forest Service "advise whether you have any objections to the requested renewals."  Ex. 3.  On June 19, 1987, the Forest Service responded that "we consent to the renewal of the above noted leases for a 10-year period."  Ex. 4.

50.     In a July 9, 1986 memorandum, the Assistant District Manager for Energy and Minerals recommended that the leases be renewed with some new terms.  Ex. 5.  Specifically, he recommended the production royalties be increased to 5 percent (from 4.5 percent), the minimum royalty in lieu of production be decreased to $3 per acre (from $10 per acre), and a minimum production requirement be added.  *Id*.  The Rolla district office joined in that recommendation in a letter dated February 1, 1988.  Ex. 6.

51.     In accordance with the recommendations, the BLM, in a decision dated September 12, 1988, proposed to renew the leases on Standard Form 3520-7 (December 1984).  Ex. 7.  Sections 2(a) and 2(b) of the proposed renewal leases, which are part of Standard Form 3520-7 (December 1984), contained the recommended new terms.  Specifically, they imposed a 5 percent production royalty, a $3 per-acre royalty in lieu of production, and a requirement for minimum production.

52.     On October 14, 1988, the Assistant District Manager for Solid Minerals sent a memorandum to the State Director revising the Rolla office recommendation and advising that the three new conditions not be added.  Ex. 8.  On October 27, 1988, the BLM vacated the September 12, 1988 decision.  Ex. 9.

53.     On April 25, 1989, the BLM issued a new decision renewing the leases, again using Standard Form 3520-7 (December 1984).  Ex. 10.  To that form, the BLM added in Section 14 two Special Stipulations marked with * and **, as follows:

> *The terms and conditions of the production royalties remains [sic] as stated in the attached original lease agreement.
>
> **The minimum annual production and minimum royalty is $10.00 per acre or a fraction thereof as stated in the attached original lease agreement.

Ex. 11.  Those asterisks correspond with the * and ** next to Clauses 2(a) and 2(b) of the 1989 Renewal Leases.  *Id.*  The first Special Stipulation reverses Section 2(a) of Standard Form 3520-7, which provides that "Lessee shall pay lessor a production royalty in accordance with the attached schedule."  *Id.*  The second Special Stipulation reverses Section 2(b) of Standard Form 3520-7, which provides that "Lessee shall produce on an annual basis a minimum amount of copper, nickel, & assoc. mins…" and "the authorized officer may allow in writing the payment of a $3.00 per acre or fraction thereof minimum royalty in lieu of production…."  *Id.*

54.     The 1989 Renewal Leases, using the standard language from Standard Form 3520-7, provided in Part I that the 1989 Renewal Leases were effective "for a period of 10 years … with preferential right in the lessee to renew for successive periods of 10 years under such terms and conditions as may be prescribed by the Secretary of the Interior, unless otherwise provided by law at the expiration of any period."  Ex. 11.  The 1989 Renewal Leases did not contain any Special Stipulation or other provision that purported to reverse Part I of Standard Form 3520-7.  *Id.*

55.     American Copper & Nickel Company, the successor-in-interest to INCO, requested a second renewal of the Leases in 1999.

56.     On March 25, 1999, the BLM asked the Forest Service to "provide this office with your recommendation regarding the renewal request and additional stipulations if necessary." On July 18, 2003, the Forest Service responded that it consented to renewal. Ex. 12.

57.     The BLM renewed the Leases effective January 1, 2004. Ex. 13. The 2004 Renewal Leases were also executed on the standard BLM form. *Id.* As with the 1989 Renewal Leases, the 2004 Renewal Leases were effective for a period of 10 years and provided for a "preferential right in the lessee to renew for successive periods of 10 years…." *Id.* The 2004 Renewal Leases attached the 1966 Leases and included the same two Special Stipulations incorporating specific terms of the original leases. *Id.* Section 1 of the 1966 Leases was not among the specific terms of the 1966 Leases that were incorporated. *Id.*

**Denial of Application for Third Renewal and Expiration of the Leases**

58.     On October 16, 2012, Beaver Bay, Inc. and Franconia, the successor-in-interest to American Copper & Nickel Company, jointly submitted an application for a third renewal of the leases. On information and belief, these entities are wholly owned and operated by Twin Metals Minnesota ("Twin Metals").

59.     To this day, 52 years after the Leases were first issued, neither Twin Metals nor any of its predecessors-in-interest have developed a mine or produced minerals on the leased lands.

60.     In processing the application for the third renewal, the BLM asked the then-Solicitor of the Department of the Interior, Hilary C. Tompkins, for guidance on "whether it has the discretion to grant or deny" the application for renewal of the Leases.

61.     On March 8, 2016, Solicitor Tompkins issued a Memorandum Opinion, M-37036 ("Tompkins M-Opinion"), concluding that "Twin Metals Minnesota does not have a non-

discretionary right to renewal, but rather the BLM has discretion to grant or deny the pending renewal application."  Ex. 14.  Solicitor Tompkins analyzed the language of the leases in question as well as the relevant statutes and regulations.  She found that Part I of the 2004 Renewal Leases, providing for a "preferential right in the lessee to renew for successive periods of 10 years," controlled the applicant's renewal rights.  *Id*.  She also found that Section 1(a) of the 1966 Leases, providing for "a right in the Lessee to renew the same for successive periods of ten (10) years each in accordance with regulation 43 C.F.R. § 3221.4(f) and the provisions of this lease," had not been incorporated into the 2004 Renewal Leases.  *Id*.

62.    Solicitor Tompkins specifically addressed the argument raised by Twin Metals that, because the 2004 Renewal Leases were ambiguous, she should therefore consider extrinsic evidence in interpreting the 2004 Renewal Leases.  Ex. 14.  She concluded that "there is nothing ambiguous with the renewal provision contained in the 2004 leases: there is no conflicting renewal provision referenced elsewhere in the 2004 leases and the provision has a longstanding and well established meaning."  *Id*.

63.    Because the 2004 Renewal Leases provided only a "preferential right of renewal," Solicitor Tompkins concluded that Twin Metals was not entitled to renewal of the leases but rather had only a "legal right to be preferred against other parties, should the Secretary, in the exercise of his discretion, decide to continue leasing."  Ex. 14.

64.    Although she found the issue was resolved by the terms of the 2004 Renewal Leases, Solicitor Tompkins also addressed the argument made by Twin Metals that the 1966 Leases entitled it to mandatory renewals.  Solicitor Tompkins determined that the terms of the 1966 Leases meant that "even if the Secretary can and does, as a matter of discretion, renew the lease to extend the time to commence production, there is no right to a further renewal when

production has not begun at the end of the first renewal extension period." Ex. 14.  Solicitor

Tompkins concluded that the "BLM has the same discretion regarding whether to renew the

lease for a third time as it had in determining whether to grant the initial lease."  *Id.*

65.     On June 3, 2016, in accordance with 16 U.S.C. § 508b and § 520 and 43 C.F.R.

§ 3503.13(c) and § 3503.20, the BLM asked the Chief of the Forest Service to provide a decision

on whether he consented to the renewal of the Leases.  Ex. 15.

66.     On December 14, 2016, the then-Chief of the Forest Service, Thomas Tidwell,

informed the then-Director of the BLM, Neil Kornze, that the Forest Service did not consent to

renewal of the Leases.  Ex. 1.

67.     Chief Tidwell's letter explained that he found "unacceptable the inherent potential

risk that development of a regionally-untested copper-nickel sulfide ore mine within the same

watershed as the BWCAW might cause serious and irreparable harm to this unique, iconic, and

irreplaceable wilderness area."  Ex. 1.

68.     Chief Tidwell's 21 page letter detailed the factual and legal considerations that

contributed to his judgment.  Specifically, he first found that the BWCAW is an irreplaceable

resource for many reasons, but in particular because of its "extremely high water quality."  Ex. 1.

He also noted the lengthy history of federal legislative protection for the BWCAW and

surrounding areas, including outright bans on mining in the BWCAW and the MPA, and the

special requirement to obtain Forest Service consent for mining any federally-owned minerals in

the Superior National Forest.  *Id.*

69.     Chief Tidwell also found that "[i]rrespective of the [Tompkins] M-Opinion, the

[Forest Service's] consent to any hardrock lease renewal is mandated by 16 U.S.C. § 508b and

Section 402 of Reorganization Plan No. 3 of 1946, 60 Stat. 1097, 1099."  Ex. 1.

70.     Chief Tidwell made detailed factual findings supporting his conclusion that "there is no reason to doubt that the mining operations TMM hopes to eventually conduct could result in [acid mine drainage] and concomitant metal leaching both during and after mineral development given the sought after copper-nickel ore is sulfidic."  Ex. 1.

71.     Chief Tidwell's letter considered publicly available information concerning the potential mine, including a 2014 Pre-Feasibility Study conducted on behalf of Twin Metals's ownership.  The photograph below shows the location of the mine outlined in Twin Metals's public plans:



72.     In support of his finding, Chief Tidwell observed that acid mine drainage "occurs when sulfide minerals present in ore bodies and rock overburden are exposed to air and water." *Id*.  The exposure creates sulfuric acid and leaches harmful metals.  *Id*.  Contaminated water can "enter streams and lakes through wastewater management plant discharges, uncollected runoff and leakage, concentrate spills, pipeline spills, truck accidents, spillway releases, tailings dam failures, water collection and treatment operation failures, and post-closure failures."  *Id*.

73.     The leased lands, including the likely sites of the Twin Metals mine, overlay the Duluth Complex containing nickel-copper-platinum group element deposits, which can produce significant amounts of acid.  *Id*.  Because of the low buffering capacity of the lakes and streams in the region, the direct flow of water from the leased lands into the BWCAW, and the proposed and likely placement of certain key mining facilities for the Twin Metals mine as indicated in Twin Metals's public plans, as well as the history of similar mines, Chief Tidwell concluded it was likely that acid mine drainage would contaminate the BWCAW and cause adverse effects to the water quality, fish populations, aquatic ecosystems, and animal species.  *Id*.  Finally, Chief Tidwell considered the possibility of containment and remediation strategies, and found that very few would be compatible with maintaining the BWCAW's wilderness and character.  *Id*.

74.     On December 15, 2016, based on the Forest Service's decision to withhold consent, the then-BLM Eastern States Director, Karen Mouritsen, denied the renewal applications.  Ex. 16.

75.     The Leases expired on December 15, 2016, or shortly thereafter.  43 C.F.R. § 3514.25.

76.     On September 12, 2016, before the Forest Service had withheld its consent and the BLM had denied the lease renewals, Franconia and its affiliate Twin Metals Minnesota filed

a lawsuit against the United States in the District of Minnesota, challenging Solicitor Tompkins' M-Opinion. The case was assigned to Judge Susan Nelson. On February 21, 2017, Judge Nelson granted NMW's motion to intervene. Also on February 21, 2017, the plaintiffs amended their complaint to reflect the Forest Service's non-consent decision and the denial of the two lease renewal applications. Both the United States and NMW moved to dismiss the complaint for lack of jurisdiction. Judge Nelson had not ruled on the merits of the motions by the time the plaintiffs voluntarily dismissed their suit.

***The BLM Reinstates the Expired Leases***

77.     On December 22, 2017, Daniel Jorjani, Principal Deputy Solicitor, issued a new Memorandum Opinion, M-37049 ("Jorjani M-Opinion"), withdrawing and replacing the Tompkins M-Opinion. Ex. 17.

78.     The Jorjani M-Opinion is premised on the assertion that the 2004 Renewal Leases "are ambiguous as to the extent to which the provisions of the 1966 leases are incorporated." Ex. 17. In particular, the Jorjani M-Opinion contends that Section 14 of the 1989 and 2004 Renewal Leases, which contains the two Special Stipulations, "is ambiguous because it does not precisely state which sections of the 1966 lease are being incorporated." *Id*. According to the Jorjani M-Opinion, the "terms and conditions of the production royalties" are "interspersed throughout the 1966 leases" in Sections 2, 5 and 14, and therefore it is ambiguous as to which of these provisions from the 1966 Leases are incorporated into the 1989 and 2004 Renewal Leases. *Id*. The Jorjani M-Opinion then states: "Given this ambiguity, extrinsic evidence beyond the 'four corners' of the document may be considered to ascertain the intent of the contracting parties." *Id*.

79.     The Jorjani M-Opinion also cites the lack of an integration clause in the 1989 and 2004 Renewal Leases.  Ex. 17.  The Jorjani M-Opinion contains no analysis of the parties' intent regarding integration.

80.     Relying on extrinsic evidence, the Jorjani M-Opinion concludes that the 1966 Leases, including in particular Section 1(a), were incorporated *in toto* into the 1989 Renewal Leases.  Ex. 17.  The Jorjani M-Opinion points out that the BLM renewed the leases in 1988 but then quickly vacated that renewal decision "because the new lease forms submitted for signature will alter the terms and conditions of the original leases."  *Id*.  The Jorjani M-Opinion also cites the fact that the BLM stated in the transmittal letter for the 1989 Renewal Leases that the BLM had agreed to renew them "under the existing terms and conditions of the original leases."  *Id*.  According to the Jorjani M-Opinion, this extrinsic evidence indicates the BLM's intent that all of the 1966 Lease terms, including Section 1(a), would apply to the 1989 Renewal Leases.  *Id*.

81.     The Jorjani M-Opinion does not explain why it is proper to use extrinsic evidence to incorporate Section 1(a) of the 1966 Leases into the 1989 Renewal Leases even though the only ambiguity the Jorjani M-Opinion alleges is whether Sections 2, 5 and 14 of the 1966 Leases are incorporated into the Renewal Leases.

82.     Neither does the Jorjani M-Opinion explain why the BLM added the two Special Stipulations addressing production royalties, royalties in lieu of production, and minimum production, with asterisks corresponding to the asterisks on Sections 2(a) and 2(b) addressing those same topics, if its intent was to incorporate all of the terms and conditions of the 1966 Leases.

83.     Neither does the Jorjani M-Opinion explain why the BLM did not also include a Special Stipulation regarding the renewal term in Section 1(a) of the 1966 Leases if it intended to

incorporate that term into the 1989 Renewal Leases, notwithstanding the conflicting term in Part I of Standard Form 3520-7 (December 1984).

84.     The Jorjani M-Opinion concludes that the "original 1966 leases provide Twin Metals with a non-discretionary right to a third renewal, subject to readjusted terms and conditions as allowed by the 1966 leases" and therefore that the "BLM does not have the discretion to deny the renewal application." Ex. 17.

85.     On May 2, 2018, Mitchell Leverette, the Acting Eastern States Director of the BLM, issued a decision reinstating the Leases on the basis that the "BLM's prior request for Forest Service consent was based on the legal error that the United States had discretion to decide whether to renew the leases" and that the Forest Service's "December 2016 non-consent determination was not legally operative." Ex. 18. The decision cited the Jorjani M-Opinion as the authority for this legal conclusion. *Id.* The BLM did not give any other reasons for its decision. *Id.* The May 2, 2018 decision also reinstated Twin Metals's renewal application. *Id.* Joseph Balash, the Assistant Secretary for Land and Mineral Management, concurred in the May 2, 2018 decision, and stated that the decision was "a final agency action for the Department of Interior…." *Id.*

86.     The Forest Service has not withdrawn or modified its letter dated December 14, 2016 denying its consent to the renewal of the Leases.

### *Defendants' Actions Harm Plaintiffs' Interests by Threatening the Businesses and Use of the BWCAW and Superior National Forest*

87.     Each of the Plaintiff organizations has individual members, customers, or clients who regularly use and enjoy the BWCAW and Superior National Forest for a variety of purposes, including canoeing and outdoor recreation, wildlife viewing, cultural and spiritual

purposes, and aesthetic appreciation.  Plaintiffs' customers and members value the remoteness,

beauty, and largely unspoiled nature of the landscape and the ecological and hydrological

resources found throughout the BWCAW and Superior National Forest, including the area

covered by the Leases.

88.     On information and belief, Interior's and the BLM's decision to reinstate the

Leases has already triggered a series of preliminary development activities that are causing and

will continue to cause immediate harm to Plaintiffs.

89.     Shortly after the reinstatement in May 2018, Twin Metals requested an

amendment to its 2013 Plan of Operations for the leased land.  The 2013 Plan of Operations

called for two hydrogeological wells that were never developed.  The amendment requests four

wells instead of two.  These new wells will require the construction of additional roads.

90.     Twin Metals has informed some property owners in the area that the drilling

program will last until August 27, 2018, and the drilling will take place 24 hours a day, 7 days a

week during this period.

91.     Such a program would cause constant noise and light pollution, as drilling

operations and road construction are expected to occur 24 hours a day, 7 days a week.  The noise

will be audible to Plaintiffs' owners, customers and members, in particular those who live near

the leased areas.  Twin Metals conducted similar drilling in prior years, and the noise from that

drilling created significant harms to Plaintiff businesses.

92.     Twin Metals has placed placards or signs stating "Access Restricted TMM &

TMM Contractors Only," on at least one entrance gate to Forest Service land covered by the

Leases.  On information and belief, Twin Metals plans to bar access to more Forest Service land

by placing restricted-access signs on either side of commonly used roads leading to Forest

Service and State of Minnesota lands stating "Twin Metals Minnesota Authorized Personnel Only," and "PERSONAL PROTECTIVE EQUIPMENT REQUIRED BEYOND THIS POINT. HARD HAT, FOOT PROTECTION, HEARING PROTECTION, EYE PROTECTION, HIGH VISIBILITY OUTERWEAR."  As a result of the reinstatement of the Leases, Plaintiffs (and the rest of the public) are not able to access and use the leased lands.

93.     These severe detriments will worsen if sulfide-ore copper mining occurs within the watershed of the BWCAW.  If Interior and the BLM's decision to reinstate the Leases and the renewal application is allowed to stand, NMW and its members will face irreparable harm. Conversely, a favorable decision will redress this injury by substantially diminishing the possibility of sulfide-ore mining in the watershed of the BWCAW.

94.     Sulfide-ore copper mining would threaten to pollute clean water and damage the important forest habitat used by many types of wildlife.  Sulfide-ore copper mining has a consistent record of devastating environmental harm, including contaminated waters, degraded forests, and unpredicted, catastrophic spills of toxic materials.  There are inherent risks to sulfide-ore copper mining.  Indeed, data from the U.S. Environmental Protection Agency show sulfide-ore copper mining to be the leading generator of toxic waste in the nation.

95.     Scientific reports show that low buffering capacity of water and soil and the interconnection of lakes and streams make the watershed of the BWCAW and Voyageurs National Park particularly vulnerable to the impacts of sulfide-ore copper mining.  Sulfide-ore copper mining could inject sulfuric acid, sulfides, sulfates, and heavy metals into the watershed. From the location of the two mining Leases, water flows into and through the heart of the BWCAW, through the Quetico Provincial Park in Canada along the U.S. border, and finally into Voyageurs National Park.  Consequently, clean water—the natural asset most essential to the

health of the BWCAW, Quetico, and Voyageurs—is also the resource most at risk of permanent

pollution from sulfide-ore copper mining in the watershed of the BWCAW.

96.     Voyageur Outward Bound School is a nonprofit organization with its major base

of operations located adjacent to the BWCAW that works with people on multi-week expeditions

into the BWCAW to improve students' perseverance, strength, and mental toughness with hopes

that they take those skills and determination back home to serve and better their communities.  In

addition, veterans participate in veterans' dogsled expeditions with Voyageur Outward Bound

School.  The expeditions use the wilderness and its soundscape to help veterans transition back

to civilian life by offering a chance to heal from the effects of post-traumatic stress disorder,

depression, and anxiety.  Exposure to a largely uninterrupted ecosystem and pristine natural area

is critical to this experience.  Sulfide-ore copper mining would diminish the experience for all

participants.

97.     Plaintiff businesses and their owners also have direct links to the Superior

National Forest and BWCAW, have staked their livelihoods on these wilderness areas, and rely

on pristine waters, a healthy ecosystem, an abundance of wildlife, and the quiet and serenity of

the deep wilderness to effectively conduct their operations.

98.     Plaintiff businesses would be devastated by sulfide-ore mining adjacent to the

BWCAW.  These businesses and their owners guide canoe trips through the BWCAW; operate

retail and outfitting operations that provide wilderness paddlers with outfitting services,

accommodations, BWCAW entry permits, canoes, camping gear, food, knowledge and

information about the BWCAW, and recreational opportunities such as swimming, boating,

kayaking, canoeing, guided fishing, and hiking; provide camping trips in the BWCAW; and

operate cafés and destination gift and souvenir stores, among other things.

99.     Customers and clients of these businesses from all over the world would feel the effects of a negatively altered wilderness experience.  Individuals and groups travel from as near as Minnesota and the Midwest to as far as Florida, New York, California, Japan, Germany, Switzerland, the UK, Zimbabwe, Brazil, France, the Netherlands, Austria, and other countries and continents to visit the BWCAW.  Sulfide-ore copper mining would negatively impact Plaintiff businesses and their owners, as the public perception of the BWCAW as a place of wilderness and clean water would be damaged.

100.     In reliance on the June 2016 Forest Service announcement that it did not plan to renew the Leases, several Plaintiff businesses made considerable financial investments in their respective businesses with the understanding that mining would not be allowed on the leased lands.

101.     Individual members of NMW have direct and specific interests in keeping sulfide-ore copper mining and the associated habitat disruption, noise, and pollution out of the BWCAW and its watershed.  Some NMW members are property owners who have homes and cabins and spend significant time in surrounding areas of the Wilderness and on Superior National Forest lands adjacent to or near the BWCAW, including on Jock Mock Lake, the Gunflint Trail, Hungry Jack Lake, Snowbank Lake, White Iron Lake, Burntside Lake, Sawbill Lake, Bald Eagle Lake, Gabbro Lake, Little Gabbro Lake, South Farm Lake, the South Kawishiwi River, Birch Lake, and Forest Service lands east of the South Kawishiwi River.  Some of these locations, like the South Kawishiwi River, Birch Lake, White Iron Lake, and South Farm Lake, are along or near the reinstated lease sites.

102.     NMW's members are property owners, business owners, tribal members, veterans, hunters, anglers, and recreational visitors, whose livelihoods and property interests will

be harmed by mining.  Sulfide-ore mining in the watershed of the BWCAW will negatively affect the recreational interests of Plaintiffs.  NMW members participate in canoeing, kayaking, camping, fishing, hunting, hiking, backpacking, trail running, swimming, cross-country skiing, snowshoeing, skijoring, dogsledding, berry picking, teaching wilderness skills, wildlife watching, and photography, among other activities.  Residents, friends, family members of multiple generations, business owners, boy scout troops, church groups, veterans, and numerous other groups of individuals and organizations partake in these activities, and all stand to lose their enjoyment of these wilderness experiences if sulfide-ore copper mining occurs next to the Wilderness in the BWCAW watershed.

103.    NMW members frequently paddle on, utilize, and enjoy waters that include the South Kawishiwi River, the Basswood River, Birch Lake, the White Iron chain of lakes, Fall Lake, Newton Lake, Pipestone Bay of Basswood Lake, and the border lakes (Crooked, Iron, Lac La Croix, Loon, Little Vermilion, and Sand Point Lakes, among others).  These waters, among others, would be in the path of pollution if the expired sulfide-ore mineral Leases at issue in this case were to be renewed and a mine complex developed.  The development of a sulfide-ore copper mining district in the BWCAW watershed would inevitably pollute surrounding lakes, groundwater and downstream waters in the BWCAW, and both the quality and public image of the BWCAW as an authentic, pure, natural outdoor recreational paradise would be harmed.

104.    The effects of sulfide-ore copper mining on land and property owners are already harsh.  The current threat of sulfide-ore copper mining has already depreciated property values. Land values plummeted after exploratory drilling noise and pollution began in 2006.

105.    Sulfide-ore mining will cause Plaintiff property owners to be left with devalued land, and those with homes or businesses dependent upon the BWCAW will be forced to sell

dc-929367

their property at steep discounts or close their doors.  If the Leases are renewed and the mine is

developed, several Plaintiffs will be forced to close their businesses and will lose even more

property value than they have already lost due to the exploratory work that has already occurred.

One 2014 University of Minnesota study showed that 23 percent of area property owners said

they would move away from the area if mining were allowed in the area.  Indeed, the

development of the mine would cause some NMW members to move away from their current

homes.

106.    Scientists and physicians have attested to the effect that sulfide-ore copper mining

has on people and the environment.  Several of the substances most toxic to human health are

released by hard-rock or sulfide-ore copper mining, including arsenic, asbestos, cadmium,

mercury, and lead.  Contaminating surface water, groundwater, and the air with these substances

would have serious environmental and health consequences for those who live or work near the

mining.

107.    Scientists and physicians also understand and appreciate the multitude of short-

and long-term health benefits of spending time in the wilderness.  Spending time in the BWCAW

has quantifiable positive impacts on physical, emotional, and psychological health.  A growing

body of scientific evidence shows that time spent in the wilderness improves objective,

measurable health markers such as blood pressure, heart rate, cortisol and blood glucose, as well

as improvements in subjective markers such as mood and emotional well-being.  Additionally,

time spent in wilderness has been shown to improve children's neurocognitive development.

These experiences strengthen children's immune systems and instill critical thinking and

problem-solving strategies that aid in the development of resilience and self-reliance.  These

benefits cannot be replicated outside of a true wilderness environment; they require the space,

the communing with nature, the quiet, and the challenge presented by pristine wilderness.

108.    Sulfide-ore mining would also have long-lasting negative effects on fish and

wildlife.  The Superior National Forest and BWCAW forest landscape would be altered such that

it could no longer provide a habitat for diverse species and complex chains of life within the

forest.  Mine construction would counter proper management of critical lynx habitat within the

Superior National Forest, and that habitat would be difficult, if not impossible, to return to its

original state if destroyed.  A mining complex would also cause habitat fragmentation and

devastating loss of forest habitat on the edge of the BWCAW, harming moose and other species

as a result.

109.    All of these impacts would have a detrimental effect on NMW and all of its

members.   NMW's environmental and financial interests would be harmed if the Court allows

Interior's and the BLM's decision to reinstate the Leases to stand and the resulting exploratory

and development activities to continue.

## CLAIM FOR RELIEF

### COUNT I: INTERIOR AND BLM LACK AUTHORITY TO RESCIND THE PRIOR DECISION AND REINSTATE THE EXPIRED LEASES

110.    Plaintiffs reassert and incorporate by reference all of the above allegations.

111.    The APA prohibits Defendants from acting in a manner that is in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right.  5 U.S.C. § 706(2)(C).

The APA also prohibits Defendants from acting in a manner that is arbitrary and capricious, or

otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

112.     Interior's and the BLM's reinstatement of the 2004 Renewal Leases is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, as well as arbitrary and capricious, because neither the BLM nor Interior had authority to reinstate the 2004 Renewal Leases over 16 months after their expiration, and 26 months after the alleged legal error on which the reinstatement was based.

113.     Interior and BLM's sole authority to issue leases in the Superior National Forest is 16 U.S.C. § 508b and § 520 and the regulations implementing those statutory authorities. There is no authority to undo a decision to reject a lease renewal application based on a purported legal error and, even if there were, any such action must be accomplished within a short and reasonable time.

114.     Interior and the BLM rejected Twin Metals's applications for renewal of the Leases in a decision dated December 15, 2016.  The decision to reject the renewal applications was a final agency action.

115.     Pursuant to 43 C.F.R. § 3514.25, the 2004 Renewal Leases expired on Twin Metals's receipt of the notice rejecting the renewal applications.  On information and belief, Twin Metals received the notice from the BLM on or about December 15, 2016.  The 2004 Renewal Leases therefore expired on December 15, 2016 or shortly thereafter.

116.     Interior and the BLM issued a decision on May 2, 2018 that "rescinds" the December 15, 2016 decision rejecting the renewal applications and "re-instates mineral leases MNES 01352 and MNES 01353, which were issued in 2004, and reinstates Twin Metal's 2012 lease renewal application."  The May 2, 2018 decision is a final agency action.  5 U.S.C. § 704.

117.     The May 2, 2018 decision was based on a claimed "legal error" in the Tompkins M-Opinion, which was issued on March 6, 2016.

118.    There is no provision in 16 U.S.C. § 508b, § 520, or the regulations implementing those statutory authorities permitting Interior or the BLM to reinstate expired leases, and the May 2, 2018 decision did not cite any such authority.  Interior and the BLM therefore acted in excess of statutory authority and in an arbitrary and capricious manner in reinstating the Leases.

119.    The decision to correct the claimed legal error by rescinding the December 15, 2016 decision and re-instating the 2004 Renewal Leases was not done within a short and reasonable time period after the issuance of the Tompkins M-Opinion or the decision rejecting the lease renewal applications.  The May 2, 2018 decision did not cite any unusual circumstances to justify the inordinate length of time between the claimed legal error and the decision to correct that claimed error.  The May 2, 2018 decision did not consider any reliance interest of Plaintiffs or others on the decision rejecting the renewal applications.

120.    The decision to reinstate the Leases was therefore without authority and arbitrary and capricious.

## COUNT II: THE REINSTATEMENT OF THE LEASES IS ARBITRARY AND CAPRICIOUS BECAUSE THE JORJANI M-OPINION IS RIDDLED WITH ERRORS

121.    Plaintiffs reassert and incorporate by reference all of the above allegations.

122.    The APA prohibits Defendants from acting in a manner that is arbitrary and capricious, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

123.    Interior's and the BLM's reinstatement of the 2004 Renewal Leases is arbitrary and capricious because the prior decision rejecting the lease renewal application was well supported, and the decision to reinstate the 2004 Renewal Leases after a change in administrations is not based on reasoned analysis and was done without consideration of Plaintiffs' and others' reliance on the expiration of the Leases.

124.     Interior's and the BLM's arbitrary and capricious reinstatement of the 2004 Renewal Leases impinges upon Plaintiffs' business, recreational, and aesthetic interests protected by Boundary Waters Canoe Area Wilderness Act of 1978, 16 U.S.C. § 508b, and 16 U.S.C. § 520.

125.     The prior decision rejecting the lease-renewal application rested on the Tompkins M-Opinion and the Forest Service's non-consent decision.  The Tompkins M-Opinion is based on a careful analysis of the law and the provisions of the Leases.  Likewise, the Forest Service's decision to withhold consent to the lease renewals is well supported by extensive fact-finding regarding the likely harms that would result from sulfide-ore mining next to the BWCAW.

126.     The Tompkins M-Opinion properly concluded that the 2004 Renewal Leases provided Twin Metals with a preferential right to renew, which provided Twin Metals with only a legal right to be preferred against other parties should the BLM, in the exercise of its discretion, decide to continue leasing.  Accordingly, to the extent the BLM decided not to lease the subject area, it had no obligation to renew the 2004 Renewal Leases.

127.     The May 2, 2018 decision reinstating the Leases is a final agency action. 5 U.S.C. § 704.

128.     Interior's and the BLM's reinstatement of the 2004 Renewal Leases relies on the assertion in the Jorjani M-Opinion that the rejection of the renewal applications was legal error because the BLM does not have discretion to deny the requested renewals.

129.     The Jorjani M-Opinion incorrectly concludes that the BLM is required to renew the 2004 Renewal Leases.  The Jorjani M-Opinion improperly relies on extrinsic evidence, inappropriately uses extrinsic evidence to contradict Part I of the 2004 Renewal Leases that plainly provides for a preferential right to renew, and mischaracterizes the extrinsic evidence.

35

130.    Moreover, the Tompkins M-Opinion expressly considers and rejects the argument that the Renewal Leases are ambiguous.  Neither the Jorjani M-Opinion nor the May 2, 2018 decision identify any rationale not already considered in the Tompkins M-Opinion.

131.    Neither the Jorjani M-Opinion nor the May 2, 2018 decision consider the Plaintiffs' and others' reliance on expiration of the Leases.

132.    Interior's and the BLM's reinstatement of the 2004 Renewal Leases is therefore arbitrary and capricious.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    declare that Defendants violated the Administrative Procedure Act;

2.    declare that the reinstatement of the 2004 Renewal Leases exceeds Interior's and BLM's authority under law and is arbitrary and capricious;

3.    grant an order and judgment vacating and invalidating Defendants' reinstatement of the 2004 Renewal Leases and Twin Metals's renewal application;

4.    grant injunctive relief staying and enjoining Defendants' further consideration of the applications to renew the 2004 Renewal Leases; and

5.    grant such other and further relief the Court deems just and proper.

dc-929367

Dated:  June 21, 2018                    Respectfully submitted,


                                         By: /s/ Joseph Alexander Ward
                                         _____

                                         Joseph Alexander Ward (D.C. Bar No. 463927)
                                         Dustin C. Elliott (*pro hac vice* application pending)
                                         MORRISON & FOERSTER LLP
                                         2000 Pennsylvania Ave., NW
                                         Washington, DC  20006-1888
                                         Telephone: 202.887.1500


                                         Thomas B. Heffelfinger (*pro hac vice* application pending)
                                         Amy S. Conners (*pro hac vice* application pending)
                                         BEST & FLANAGAN LLP
                                         60 South Sixth Street
                                         Suite 2700
                                         Minneapolis, MN 55402
                                         Telephone: 612.339.7121

                                         *Attorneys for Plaintiffs*

dc-929367