# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**VOYAGEUR OUTWARD BOUND SCHOOL**, *et al.*,

              Plaintiffs,

        v.

**UNITED STATES**, *et al.*,

              Defendants,

        v.

**TWIN METALS MINNESOTA LLC**, *et al.*,

              Defendant-Intervenors.

Case No. 1:18-cv-01463 (TNM)

---

**WILDERNESS SOCIETY**, *et al.*,

              Plaintiffs,

        v.

**RYAN ZINKE**, *et al.*,

              Defendants,

        v.

**TWIN METALS MINNESOTA LLC**, *et al.*,

              Defendant-Intervenors.

Case No. 1:18-cv-01496 (TNM)

FRIENDS OF THE BOUNDARY WATERS
WILDERNESS, *et al.*,

        Plaintiffs,

        v.

BUREAU OF LAND MANAGEMENT, *et al.*,

        Defendants,

        v.

TWIN METALS MINNESOTA
LLC, *et al.*,

        Defendant-Intervenors.

Case No. 1:18-cv-01499 (TNM)

## <u>MEMORANDUM OPINION</u>

When do federal agencies get a mulligan?  Is one year later too late to take a second shot?  Can they completely change their minds?  And, if so, what kind of explanation justifies their reversal?

When the Department of the Interior ("Interior") reinstated Twin Metals Minnesota's mining leases in Minnesota's Superior National Forest one year after canceling those leases, local businesses and conservation groups objected.  The leases had expired.  Interior could not reverse course one year later by claiming that the original lease cancelation was erroneous, they claimed.  Naturally, Interior disagreed.  It claims agencies have "inherent reconsideration authority" which allows them to review and reverse prior decisions—particularly when there is an error to correct.  And its first decision was riddled with legal errors.

The Court agrees with Interior. Because Interior has inherent authority to timely reconsider its prior decisions and reasonably did so here, the Court will grant summary judgment to the Defendants.

## I.

More than fifty years ago, a division of Interior—the Bureau of Land Management (BLM)—issued two mining leases to Twin Metals' predecessor, International Nickel Company (INCO).[1] Joint App'x 102–25, ECF No. 73-1 ("J.A. 2").[2] These leases gave Twin Metals the exclusive right to mine certain minerals in northern Minnesota on Weeks' Act lands, 16 U.S.C. § 515, and in the Superior National Forest. *Id.* at 114–15. The leases lasted for a twenty-year term and were subject to several renewal terms. *Id.* Twin Metals applied for and received lease renewals in 1989 and 2004. *Id.* at 53–57, 70–73.

In 2012, Twin Metals again applied to renew the leases. *Id.* at 41–49. But Interior denied its application. Joint App'x 35–38, ECF No. 73 ("J.A. 1"). Interior's then-Solicitor Hilary Tompkins issued a legal opinion ("Tompkins Opinion") finding that the 2004 renewed leases only afforded Twin Metals a "preferential right" of renewal—not automatic renewal. *Id.* at 51. This meant that, under the two statutes that govern development of federal hardrock minerals on these leased areas, Interior needed to seek consent of the Secretary of Agriculture before authorizing mineral development. *See* 16 U.S.C. § 508b; 16 U.S.C. § 520. Particularly, before renewing Twin Metals' leases, BLM needed to "consult[] with the Forest Service"—a branch of the Department of Agriculture—to determine whether the leases were "consistent with the decision, terms, and conditions of the applicable comprehensive land use plans for the area"

---

[1] Although International Nickel Company negotiated the leases originally, for purposes of this Opinion, the Court will refer to INCO as its successor, Twin Metals.

[2] All page citations refer to the pagination generated by the Court's CM/ECF system.

and obtain "Forest Service consent[] to the permit or lease." *See* Defs.' Cross Mot. Summary J. 24, ECF No. 66 (citing 43 C.F.R. § 3501.17(a); 43 C.F.R. § 3503.13(a)(1); 43 C.F.R. § 3503.13(c)). The Forest Service refused consent, *see* Joint App'x 34, ECF No. 73-2 ("J.A. 3"), so Interior rejected Twin Metals' renewal application later that year, J.A. 1 at 35–37.

One year after Interior's official rejection, the new Acting Solicitor of the Interior, Daniel Jorjani, rescinded the Tompkins Opinion and issued a new one ("Jorjani Opinion"). J.A. 1 at 14. This opinion concluded that Tompkins misapplied contract law and misinterpreted the lease. *Id.* at 32. The correct interpretation of the leases proved that Twin Metals was entitled to "a non-discretionary right to a third renewal." *Id.* Since "BLM's prior request for Forest Service consent was based on the legal error that the United States had discretion to decide whether to renew the leases," Interior informed the Forest Service that its denial of consent to the leases "was not legally operative." *Id.* at 12. BLM needed not obtain consent for non-discretionary renewals. So five months later, Interior officially reinstated the leases. *Id.* at 11.

Plaintiffs (collectively, "Voyageur")—businesses and conservation groups that assert interests in the Superior National Forest and Boundary Waters Wilderness where the leased land is located—object that this reversal was unlawful. They filed three separate cases under the Administrative Procedure Act ("APA") claiming, first, that Interior exceeded its authority by reversing the Tompkins Opinion. *See* Voyageur Compl. ¶ 110–20, No. 18-cv-01463, ECF No. 1; Wilderness Soc'y Compl. ¶ 52–55, No. 18-cv-01496, ECF No. 1; Friends of the Boundary Waters Wilderness (FOBW) Compl. ¶ 110–116, No. 18-cv-01499, ECF No. 7.

Second, they insist that Interior's renewal of Twin Metals' leases was "not otherwise in accordance with law."  In other words, reissuing the leases violated the mining authorization statute for the Superior National Forest, 16 U.S.C. § 508(b); the Federal Land Policy and

Management Act, 43 U.S.C. § 1701(a)(8); the Boundary Waters Wilderness Act, Pub. L. No. 95-495, 92 Stat. 1649, § 2(4) (1978); the Wilderness Act, 16 U.S.C. § 1133(b); and the National Forest Management Act, 16 U.S.C. § 1604(g)(3).  *See* Voyageur Compl. ¶ 121–32; Wilderness Soc'y Compl. ¶ 47–51, 56–61; FOBW Compl. ¶ 117–129.

The Court consolidated these cases and permitted Twin Metals and Franconia Minerals (collectively, "Twin Metals") to appear as Defendant-Intervenors.  *See* Minute Order (July 25, 2018); Minute Order (June 28, 2018).  The parties have now filed cross motions for summary judgment.  *See* Pls.' Mot. Summ. J., ECF No. 61; Defs.' Cross Mot. Summ. J., ECF No. 67; Intervenor Cross Mot. Summ. J., ECF No. 64.  The Court held a consolidated motions hearing and invited supplemental briefing on two outstanding legal questions.  *See* Minute Entry (Dec. 20, 2019); Order (Jan. 3, 2020) ECF No. 76.  The case is now ripe for adjudication.

## II.

A court will normally grant summary judgment when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  But Rule 56's standards do not apply in APA cases.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006).  In these cases, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club*, 459 F. Supp. 2d at 90 (citing *Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).

Under the APA, the Court will set aside Interior's decision only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Grant Med. Ctr. v. Hargan*, 875 F.3d 701, 705 (D.C. Cir. 2017) (quoting 5 U.S.C. § 706(2)(A)).  The Court must determine

whether "the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (citations omitted), *aff'd sub nom. Fulbright v. Murphy*, 650 F. App'x 3 (D.C. Cir. 2016).

At all stages of litigation, Plaintiffs must also prove that they have standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On summary judgment, this means that Plaintiffs must "identify in [the] record evidence sufficient to support [their] standing to seek review[.]" *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).

### III.

Voyageur mounts two APA-based attacks on Interior's reissuance of Twin Metals' leases. First, it contends that the lease renewals were unlawful because Interior lacked the authority to reconsider its initial decision. Pls.' Mot. at 26–35. Second, Voyageur urges that even if Interior had the authority to reconsider its decision, that decision was "arbitrary and capricious or not otherwise according to law." *Id*. at 35–58. The Court rejects both arguments.

### A.

Agencies possess "at least some inherent authority to revisit their prior decisions[.]" *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *see* Mot. Summ. J. H'ring Tr. 7:7–8 (Dec. 20, 2019) (admitting Plaintiffs recognize that "absolutely" there is "some right" for agencies to reconsider their decisions). But just how broad is that authority? According to Voyageur, it is narrow.

Relying on a string of 1980s cases from the D.C. Circuit, Voyageur contends that an agency's reconsideration authority "is limited to ministerial errors or inadvertent failures to

consider relevant issues." Pls.' Mot. at 28. Interior, relying on a separate line of cases, insists that an agency has broad "inherent power to reconsider and change a decision if it does so within a reasonable period of time." Defs.' Mot. at 54–55 (quoting *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977)).

The distinction between the line of supporting cases in each parties' argument is telling. Voyageur generally tries to cabin Interior's reconsideration authority within the "ministerial error doctrine." But Interior relied on a distinct, though similar, power when it reassessed its lease decision: its inherent reconsideration authority. Courts have not restricted this authority to correction of clerical errors. Instead, they have imposed only two limitations. First, the reconsideration must be timely and, second, Congress must not have limited this power.

## 1.

Interior never pretended it was fixing a clerical error when it changed course on Twin Metals' renewal application. Defs.' Mot. at 54–56. Interior originally denied the lease renewal application, but it later decided to reconsider its analysis. While reviewing the Tompkins Opinion, Interior claims it discovered substantive legal errors misinterpreting the lease terms. J.A. 1 at 12, 32. According to Voyageur, this admission is fatal because Interior was not correcting a ministerial or inadvertent error. Pls.' Reply 20–21, ECF No. 69. But Voyageur is mistaken. Though in *some* circumstances, an agency's authority to correct decisions is limited to ministerial or accidental errors, the inherent reconsideration authority that Interior relied on here is not so constrained.

The "ministerial error doctrine" stands for the unremarkable proposition that agencies may correct clerical errors even in final, *unreviewable* decisions. Consider two of the primary cases that Voyageur cites—*International Paper Co. v. FERC*, 737 F.2d 1159 (D.C. Cir. 1984)

and *Hirschey v. FERC*, 701 F.2d 215 (D.C. Cir. 1983). In those cases, the Federal Energy Regulatory Commission (FERC) tried to vacate exemptions that it had issued to licensing requirements of the Federal Power Act. *Int'l Paper*, 737 F.2d at 1163; *Hirschey*, 701 F.2d at 217. Under FERC's own regulations, enough time had passed to render those exemptions final and unreviewable. *Int'l Paper*, 737 F.2d at 1162; *Hirschey*, 701 F.2d at 217. Still, FERC claimed that it had the authority to "vacate an otherwise final and nonreviewable order under the 'ministerial' or 'clerical' error doctrine." *Int'l Paper*, 737 F.2d at 1163; *see id*. at 1163 n.7 (noting that the ministerial error doctrine "apparently found its genesis in *Hirschey* dicta"); *see also Hirschey*, 701 F.2d at 218–19. Because the D.C. Circuit determined that FERC was not seeking to correct a clerical error, the court did not allow FERC to vacate the exceptions in either case. *Int'l Paper*, 737 F.2d at 1163–64; *Hirschey*, 701 F.2d at 218–19; *see also Howard Sober, Inc. v. ICC*, 628 F.2d 36, 40–41 (D.C. Cir. 1980) (determining that the Interstate Commerce Commission could revise a certificate without following normal notice and hearing procedures since it was only fixing a clerical error). But had FERC been correcting a scrivener's error, it would have been able to, even though the decisions were otherwise final and unreviewable.

Interior's denial of Twin Metals' renewal application was not an unreviewable decision. Unlike *International Paper* and *Hirchey*, no statute or regulation rendered the decision permanent within a fixed timeframe. *Int'l Paper*, 737 F.2d at 1162; *Hirschey*, 701 F.2d at 217. Nor was it trying to circumvent any regulatory or statutory procedures that it would normally follow to modify a decision. *See Howard Sober*, 628 F.2d at 41. If the decision was unreviewable or if Interior could only modify it by following some other procedure, then—as Voyageur argues—the ministerial error doctrine would apply and Interior would need to show that it was only fixing some typographical, not substantive, error.

But since the decision was reviewable, the ministerial error doctrine does not apply. Instead, the agency's inherent reconsideration authority applies. The D.C. Circuit has repeatedly recognized that "administrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions," *Ivy Sports*, 767 F.3d at 86, because "[t]he power to reconsider is inherent in the power to decide," *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950).

The D.C. Circuit roots this authority in an agency's power to *decide*—that is, to make *substantive* decisions, not merely to correct typos.[3] *Albertson*, 182 F.2d at 399; *Mazaleski*, 562 F.2d at 720 ("[R]econsideration is often the sole means of correcting errors of procedure *or substance*." (quoting *Gratehouse v. United States*, 512 F.2d 1104, 1109 (Ct. Cl. 1975) (emphasis added)). Thus, courts permit agencies to use their inherent reconsideration authority not only to correct clerical errors, but to correct substantive errors, such as when there were "missteps in the decisionmaking process and misinterpretations of substantive law." Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1752–53 (2005).[4]

---

[3] At times, the D.C. Circuit has held that an agency misused its reconsideration authority to amend substantive decisions because a statute has prescribed another method for correcting those decisions. *See, e.g.*, *Ivy Sports*, 767 F.3d at 86 (correcting the classification of a medical device); *New Jersey v. EPA*, 517 F.3d 574, 582–83 (D.C. Cir. 2008) (removing certain electric utility steam generating units from a list of sources regulated by the Clean Air Act). But even in these cases, the court has never questioned that an agency *could* use its inherent authority to correct these types of substantive errors. It has simply held that the agency could not do so in those cases because a statute provided another method. *See Ivy Sports*, 767 F.3d at 86; *New Jersey*, 517 F.3d at 582–83 ("An agency can normally change its position and reverse a decision. . . . Congress, however, undoubtedly can limit an agency's discretion to reverse itself[.]").

[4] Agencies have broad discretion to reconsider their substantive decisions by seeking voluntary remands when those decisions are challenged in court. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (noting that an "agency may request a remand (without confessing error) in order to reconsider its previous position" or when "it believes that its original decision is incorrect on the merits and wishes to change the result"); Joshua Revesz, *Voluntary Remands: A Critical Reassessment*, 70 Admin. L. Rev. 361, 361 (2018) ("[A]gencies will typically receive voluntary remands except in unusual circumstances.").

The D.C. Circuit "commonly grant[s]" agencies' requests for voluntary remands because courts "prefer to allow agencies to cure their own mistakes rather than wasting the courts' and the parties' resources reviewing a record that both sides acknowledge to be incorrect or incomplete." *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993); *see also Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386–87 (D.C. Cir. 2017) ("The leading voluntary remand cases confirm that agency reconsideration of the action under review is part and parcel of a voluntary remand."). It would be strange indeed if agencies could not correct these erroneous decisions on their own initiative,

Consider *Belville Mining Co. v. United States*, in which the Sixth Circuit permitted Interior to reconsider and reverse a prior determination that Belville Mining Co. held rights to strip mine for coal. 999 F.2d 989, 991 (6th Cir. 1993). Interior had reached the erroneous conclusion that Belville had strip mining rights based on the "oral advice of a staff attorney and a single district court case from Ohio." *Id*. at 999. Eight months later, Interior reconsidered and reversed its determination after finding that it was reached through "wholly inadequate process." *Id.*

The court explained, "In determining whether agency reconsideration is proper in a given case, "two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." *Id.* at 997 (quoting *Civil Aeronautics Bd., v. Delta Air Lines, Inc.,* 367 U.S. 316, 321, (1961). Because "it is clear that [Interior] attempted to correct legally erroneous 1988 VER determinations that, left uncorrected, would be vulnerable to court challenge . . . rather than [implement] a change in policy," the court did not disturb the agency's reconsidered decision. 999 F.2d at 999.

In its reply brief, Voyageur backpedals from relying on the "ministerial error doctrine." It admits that "[a]gencies' ability to correct errors in final decisions may extend to both legal and substantive errors, but *only* where there was an inadvertent failure to consider relevant factors, *i.e.*, an error 'arising from oversight or omissions.'" Pls.' Reply at 21 (quoting *Am. Trucking Ass'ns, Inc. v. FRISCO*, 358 U.S. 133, 145 (1958)). For this proposition, they rely on a case in which the Supreme Court held that the Interstate Commerce Commission had "the power to modify certificates . . . containing *inadvertent* errors." *Am. Trucking*, 358 U.S. at 134 (emphasis

---

rather than waste the courts' and parties' time and resources initating a case only to request and receive a voluntary remand to reconsider.

added).  But nowhere in that opinion did the Court limit reconsideration to inadvertent errors—it merely noted that the error, in that case, was inadvertent.  *Id*. at 134, 145.  Nor does the other case Voyageur cites for this proposition—*Ranbaxy Laboratories, Ltd. v. Burwell*, 82 F. Supp. 3d 159, 194–95 (D.D.C. 2015)—even hint that agencies may reconsider only inadvertent errors.[5]

In fact, substantive reconsideration is not limited to correcting only inadvertent errors or slapdash decisions.  For instance, in *Gun South, Inc. v. Brady*, the Eleventh Circuit allowed the Government to suspend importation of certain semi-automatic rifles while the Bureau of Alcohol, Tobacco, and Firearms reassessed whether it had mistakenly interpreted a statute to permit categorizing these guns as "sporting firearms."  877 F.2d 858, 861–62 (11th Cir. 1989).  The court held that an agency's reconsideration authority meant that the "Bureau must necessarily retain the power to correct the erroneous approval of firearms import applications."  *Id.*  So in that case, unlike *Belville*, the error was not caused by a "haphazard" adjudication, but "because the agency had selected a legally tenable interpretation that it subsequently disavowed."  Bress, *supra*, at 1754–55.  Yet the court still permitted reconsideration.[6]  *Gun South*, 877 F.2d at 62.

Though this reconsideration authority is broader than the ministerial error doctrine, it is not without limits.  Agencies cannot rely on their inherent reconsideration authority when a

[5] In response to this Court's request for supplemental briefing, Voyageur also argues that Interior must prove that there was an error to correct before using its inherent authority to reconsider.  Pls.' Suppl. Br. 5, ECF No. 77.  Since the Court *does* find that Interior reasonably concluded that it erred in its initial decision, the Court need not address this argument.  *See infra* Section III.B.

[6] Voyageur tries to distinguish *Gun South* by claiming that "the issue was not an agency's authority to reverse a final decision permanently, but to suspend that decision temporarily pending an investigation as to whether it was in error[.]"  Pls.' Reply at 20.  True.  *Gun South* was *not* about an agency's authority to reverse—it was about an agency's authority to *reconsider*.  That is because Gun South was challenging the Bureau's reconsideration process itself (which involved a temporary suspension of assault weapon importation).  Reversal may follow reconsideration—as it did in *Belville*—but since the case does not involve a reversed decision, the Eleventh Circuit did not reach that issue.  In any event, this case establishes that agencies may reconsider substantive legal decisions, such as their interpretation of a statute.  *See Gun South*, 877 F.2d at 862.

separate statute prohibits reconsideration or prescribes another correction process.  *See Ivy Sports*, 767 F.3d at 86.  Nor does their authority to reconsider stretch *ad infinitum*.  The correction must occur "within a short and reasonable period," meaning "weeks, not years," unless there are "unusual circumstances."  *Mazaleski*, 562 F.2d at 720 (quoting *Gratehouse*, 512 F.2d at 1109).

As we shall see, Interior complied with both limitations.

## 2.

Voyageur suggests that Interior could not rely on its inherent authority here because Interior had another avenue to correct its rejection of Twin Metals' application: "issuing new leases."  Pls.' Mot. at 32 (citing 43 C.F.R. § 3507).  Reversing its decision based on Interior's inherent authority, then, would be an impermissible end run around the regulatory scheme.  *Id.* at 32–33.

True, agencies have no inherent reconsideration authority when there is "statutory authority to rectify the agency's mistakes."  *Ivy Sports*, 767 F.3d at 86.  For instance, in *Ivy Sports*, the D.C. Circuit rejected the FDA's attempts to rely on its inherent reconsideration authority to reclassify a medical device.  *Id.* at 86–87.  Congress created a "specific statutory mechanism to correct alleged device classification errors," so the FDA could not rely on its "inherent reconsideration authority to short-circuit that statutory process . . . to achieve that same result."  *Id.*  Similarly, in *American Methyl Corp. v. EPA*, the D.C. Circuit rejected the EPA's attempt to revoke a Clean Air Act waiver because an implied revocation power was "contrary to the intention of Congress and the design of that statute."  749 F.2d 826, 840 (D.C. Cir. 1984).  These cases emphasize that statutes can restrict an agency's inherent reconsideration authority when Congress acts to preclude agency reconsideration, *id.* at 834–38, or when an existing

statute will "achieve [the] same result" as use of the agency's inherent authority, *Ivy Sports*, 767 F.3d at 87.

Voyageur argues that 43 C.F.R. § 3507 satisfies this second provision, limiting Interior's authority. Pls.' Mot. at 32–33. Since Interior could issue new leases to Twin Metals, Voyageur says this means it *must* do so. *Id*. at 33. But, as Interior points out, Voyageur's argument suffers two deficiencies.

The first, and most obvious, is that 43 C.F.R. § 3507 is a regulation, not a statute. Courts have only displaced an agency's inherent authority when *Congress* acts to preclude it, not when the agency's own regulations provide another avenue. *See Ivy Sports*, 767 F.3d at 87; *New Jersey*, 517 F.3d, at 583; *Am. Methyl Corp.*, 749 F.2d at 840.

But regardless, the Court is unconvinced that § 3507 provides a "mechanism capable of rectifying" Interior's mistake. *See Ivy Sports*, 767 F.3d at 87. Would new leases "achieve the same result" as Interior's reconsideration? Voyageur's own argument admits that it will not. Twin Metals would need to, "among other things, pay updated rental rates, renegotiate royalty payments, and potentially obtain new prospecting permits." Pls.' Mot. at 33. This would be a steep price for Twin Metals to pay for Interior's error. And it is a far cry from *Ivy Sports* where the FDA's reversal achieved the "same result" as the statutory process: the reclassification of a medical device. 767 F.3d at 87. Newly issued, renegotiated 2020 leases simply will not include identical terms to Twin Metals' 1966 lease. Because of changes in law, it cannot. Pls.' Mot. at 33. Interior's only option to meaningfully correct its legal error was to do so through use of its inherent authority.

**3.**

But what about the other limitation on Interior's authority?  Any reconsideration must be

"timely," *Ivy Sports*, 767 F.3d at 86, and here Interior took a year to issue a revised opinion after

first denying Twin Metals' application.[7]  Does this qualify as a "short and reasonable period"?

*See Mazaleski*, 562 F.2d at 720 (quoting *Gratehouse*, 512 F.2d at 1109).

There is no consensus among the courts about what amount of time is reasonable.[8]

Perhaps this is unsurprising given the many types of agency actions and factors that lead to their

reconsideration.  The D.C. Circuit's only substantive guidance appears as part of a block

quotation from a Court of Federal Claims case:

> "[The] court will sustain the reconsidered decision of an agency, as long as the
> administrative action is conducted within a short and reasonable period.  What is a short
> and reasonable time period will vary with each case, but absent unusual circumstances,
> *the time period would be measured in weeks, not years*."

*Mazaleski*, 562 F.2d at 720 (quoting *Gratehouse*, 512 F.2d at 1109) (emphasis added).

So courts consult several factors to determine whether an agency reconsideration is

timely.  These include "(1) the complexity of the decision; (2) whether the decision was based on

fact or law; (3) whether the agency acted according to its general procedures for review;

(4) whether parties had relied upon the initial decision; (5) whether the agency acted in bad faith

---

[7]  The parties disagree over the proper method of calculating the time elapsed before reconsideration. Pls.' Mot. at 34; Intervenor's Mot. at 33 & n.4.  Since the question is whether Interior's use of its inherent authority to *reconsider*—not inherent authority to *reverse*—is timely, the appropriate timeframe seems to be between Interior's final decision and the official notification that Interior was in the reconsideration process.  That would be, here, the time between December 15, 2016, when Interior rejected the renewal application, J.A. 1 at 35, and December 22, 2017, when Interior released the Jorjani Opinion, J.A. 1 at 14.  At that point, all parties were on notice that Interior was reconsidering its original decision.  *See Belville*, 999 F.2d at 1001 n.12 (finding that the "period between the initial determinations and the notice of suspension" to be the appropriate timeframe because the parties were "on notice" that the original determinations were "actively under reconsideration").  But even under Voyageur's calculation of 26 months, Pls.' Mot. at 34, the Court would still find the reconsideration to be timely.

[8]  "[F]ederal courts have rejected periods of five months and nine months as unreasonable, yet have upheld three months, four months, and eight months as reasonable.  Oddly, two years has been held to be both reasonable and unreasonable.  And while eleven months, one year, sixteen months, and three years have been held unreasonable, four and a half years has been deemed acceptable."  Bress, *supra*, 1763–64 (internal citations omitted).

14

by advancing a pretextual explanation to justify reconsideration; (6) whether the agency provided notice of its intent to reconsider the initial decision; and (7) the probable impact of an erroneous agency decision absent reconsideration." Bress, *supra*, at 1761–62 (cleaned up); *see also Ivy Sports Med., Inc. v. Sebelius*, 938 F. Supp. 2d 47, 62 (D.D.C. 2013) (reciting the same factors), *vacated and remanded on other grounds sub nom. Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014). Not every factor is relevant in every case. Here, Interior mainly justifies the one-year delay by emphasizing the complexity of the decision. Defs.' Mot. at 59.

The Tompkins Opinion was a 13-page single-spaced "detailed and exhaustive" opinion. FOBW Compl. ¶ 77; J.A. 39–51. The reconsideration process required careful review of the leases, lease renewals, and "thousands of pages of historical documents" associated with the leases' fifty-year history. Defs.' Mot. at 59. What is more, Interior began reviewing the Tompkins Opinion in the middle of a change of the Administration, when senior-level officials were still being appointed to Interior. *Id.*; Intervenor's Mot. at 34; *see Stand Up for Cal.! v. U.S. DOI*, 298 F. Supp. 3d 136, 137 (D.D.C. 2018) ("This case involves a uniquely Washingtonian question: when can a federal employee act in the place of an absent agency or unit head? This issue becomes acute during presidential transitions, when thousands of senior political appointees exit the government, often leaving their positions vacant for months or even years."). A one-year delay may not be ideal. But here the complexity of the decision and circumstances suggest that such a delay was reasonable.

Voyageur counters that it is not enough for Interior to show merely that the time before reconsideration was "reasonable." In *Gratehouse*, the court stated that reconsideration must occur in a "short and reasonable time" which "*absent unusual circumstances* . . . would be measured in weeks, not years." 512 F.2d at 1109. Since Interior did not reconsider until one

year later, Voyageur reasons that Interior must show that "unusual circumstances" kept it from reconsidering earlier. Pls.' Reply at 23–24. Under this logic, Voyageur argues that Interior cannot rely on the complexity of the decision to establish timeliness. Agencies daily face complex legal decisions—this is far from "unusual." *Id.*

But Voyageur's interpretation of *Gratehouse* is too formulaic. The test for timeliness is whether it occurred within a "short and reasonable time." *Gratehouse*, 512 F.2d at 1109. The *Gratehouse* court hypothesized that generally this would mean "weeks, not years." *Id*. But it did not create a bright line rule that any reconsideration undertaken one year later, as happened here, is presumptively untimely. *See* Bress, *supra*, at 1761 ("The 'weeks, not years' principle, however, appears to be the approximation of a guideline as opposed to a hard and fast test."). The "reasonability" standard is flexible, which is why courts look to many factors to determine whether reconsideration was timely.

Voyageur next observes that there are no factually similar cases involving as lengthy a delay in reconsideration as was present here. Pls.' Reply at 24–25. That appears to be true. But neither are the cases limiting reconsideration to shorter periods of time helpful guideposts for the Court. Many of those cases involved reconsideration of straightforward issues, like personnel actions. *See, e.g.*, *Mazaleski v. Treusdell*, 562 F.2d 701 (D.C. Cir. 1977); *Macktal v. Chao*, 286 F.3d 822 (5th Cir. 2002). This case involves an agency's interpretation of "thousands of pages of historical documents" associated with the leases' fifty-year history. Defs.' Mot. at 59. It would hardly make sense to compare the timeliness of a decision of this magnitude with cases about "relatively straightforward personnel action." *See* Defs.' Mot. at 59 (citing *Mazaleski*, 262 F.2d at 720; *Gubisch v. Brady*, No. 88-cv-2031, 1989 WL 44083, at *10 (D.D.C. Apr. 20, 1989)).

The complexity of the decision certainly weighs in Interior's favor. And Twin Metals suggests that the other factors also tilt the balance toward Interior. First, Interior corrected an allegedly erroneous legal decision that "invit[ed] reversal under the APA." Intervenor Mot. at 35; *see Belville*, 999 F.2d at 999 (allowing reconsideration where the "legally erroneous" decision, "left uncorrected, would be vulnerable to court challenge"). Second, Plaintiffs unreasonably relied on a decision actively being challenged by Twin Metals in court. Intervenor Mot. at 35–36.

Finally, Twin Metals will likely face significant adverse impacts—not of its own making—if Interior cannot correct its erroneous decision. *Id.* at 36–37; *see Belville*, 999 F.2d at 1002 (finding that "the public interest in achieving a correct result . . . tips the scales in favor of a finding that reconsideration was timely" since failure to correct an error would destroy a national forest that would take "100 years" to replace). Twin Metals spent ten years negotiating its original 1966 lease agreement with Interior. Intervenor Mot. at 19. And it has "spent decades" and invested "more than $400 million" in developing the property. *Id.* at 14, 36. As Voyageur admits, Pls.' Mot. at 33, even if Interior were to issue new leases to Twin Metals, the leases would not contain the same terms and could not fully compensate for Interior's error.

Voyageur does not respond to any of these arguments.

One year is perhaps longer than would have been ideal for Interior to reconsider the reasoning in the Tompkins Opinion. But the Court is not convinced that this period was unreasonable. Given the complexity of the decision, the amount of evidence Interior needed to review and consider, the change in Administrations, and the significant adverse impact that allowing an allegedly erroneous decision to stand without later review would have on Twin Metals, the Court believes Interior's reconsideration was timely.

**4.**

Voyageur finally presses that Interior's reconsideration was improper because the reversed decision was a "policy change under the pretext of correcting an error." Pls.' Mot. at 31–32. The Court disagrees. To be sure, the reversal followed both a change in Administrations and a request from Twin Metals to meet with the new Secretary of the Interior, Ryan Zinke. *Id.* But that does not automatically mean that a change in policy motivated Interior's reversal.

Of course, agencies may not use error correction "as a guise for changing previous decisions" based on policy preferences. *Am. Trucking Ass'n*, 358 U.S. at 146. And, if Voyageur's allegations were true, then Interior's actions might be unlawful. But Voyageur cites no evidence that establishes this reversal was policy-based. It relies solely on inferences. Pls.' Mot. at 31–32.

This argument echoes of *Bellville*, in which the court rejected Belville's pretext argument because it "presented no evidence, beyond the timing of the change in leadership, to suggest that the new [agency director], in initiating reconsideration . . . was attempting to change existing policy rather than to correct erroneous [] determinations." 999 F.2d at 998. So too here. Generally, agencies are presumed to have properly discharged their official duties, unless there is "clear evidence to the contrary." *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2012). Not only is there no "clear evidence" of pretext, Voyageur has presented no evidence at all. If timing alone were enough to prove an agency's improper motivations, then every agency decision following a change in Administrations would be vulnerable.

**B.**

Finding that Interior had authority to reconsider its decision, the Court now turns to the heart of Voyageur's claim. Voyageur alleges, through the APA, that Interior unlawfully reissued

the leases both because it did not obtain the Forest Service's consent to renew the leases and because it essentially issued new leases without complying with proper procedures. *See* Pls.' Mot. at 32–33; Pls.' Reply at 12–13. This, they say, violated the mining authorization statute for the Superior National Forest, the Federal Land Policy and Management Act, the Boundary Waters Wilderness Act, the Wilderness Act, and the National Forest Management Act. *See* Voyageur Compl. ¶ 121–32; Wilderness Soc'y Compl. ¶ 47–51, 56–61; FOBW Compl. ¶ 117–125; Pls.' Reply at 12–13.

If Interior had determined that it had *discretion* over whether to renew the leases—as it did in the Tompkins Opinion—it would need, at the very least, to seek the Forest Service's permission before renewing the leases. Pls.' Mot. at 33. But by determining, through the Jorjani Opinion, that the leases *required* Interior to reissue the leases to Twin Metals, Interior skirted this requirement. *Id.* The reasoning in the Jorjani Opinion, Voyageur alleges, was arbitrary, capricious, or not in accordance with law. *See* Voyageur Compl. ¶ 121–32; Wilderness Soc'y Compl. ¶ 47–51, 56–61; FOBW Compl. ¶ 117–129. It seeks summary judgment on that basis.

## 1.

At the outset, Interior and Twin Metals contest Voyageur's prudential standing to assert this claim. Prudential standing, though different from Article III standing, is "a threshold, jurisdictional concept." *See Deutsche Bank Nat. Trust Co. v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013). Under the doctrine of prudential standing, in addition to establishing Article III standing, a plaintiff must "seek to vindicate his own legal rights or interests, not those of some absent third party." *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994). In Defendants' view, Voyageur seeks to enforce the leases or, put another way, enforce a contract as a third party.

Defs.' Mot. at 28–31; Intervenor Mot. at 40–43.  This, they argue, it cannot do.  Defs.' Mot. at 28–31; Intervenor Mot. at 40–43.

If this were a breach of contract case, the Court would agree.  Courts will not hear third parties on questions of contract interpretation when they are neither parties nor intended beneficiaries.  *See Deutsche Bank*, 717 F.3d at 194.  Doing so would allow plaintiffs to "seek[] to enforce the rights of third parties."  *Id*. at 194.  And here, Voyageur does not pretend that the lease terms give it any legal rights or argue that it is an "intended beneficiary."  Pls.' Reply at 12–13.  Thus, if it were seeking to enforce the leases, it would lack standing.

But Voyageur's claim is more nuanced than that.  It is not seeking to *enforce* the mining leases.  It has brought an APA claim challenging Interior's final agency action reinstating the leases.  Voyageur Compl. ¶ 121–32; Wilderness Soc'y Compl. ¶ 47–51, 56–61; FOBW Compl. ¶ 117–129.  Interior justified this action by pointing to the contract language and extrinsic evidence which, it claims, supports its decision.  J.A. 1 at 21–32.  Thus, review under the APA must, necessarily, involve the Court's evaluation of the agency's reasoning.  But that does not automatically mean that Voyageur is suing to enforce another's rights.

No, Voyageur is suing to enforce its *own* rights—given to it by Congress, enforceable through the APA.  *See* Pls.' Reply at 13 ("It is these statutory obligations Plaintiffs seek to enforce—not, as Defendants suggest, the leases themselves.").  Congress created the APA to provide judicial review to individuals "aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  In other words, individuals may sue when an agency violates a statute if they meet the requirements for Article III standing—injury, causation, and redressability, *see Lujan*, 504 U.S. at 560–61—*and* their interests "fall within the zone of

interests protected by the law invoked," *see Indian River Cty. v. United States DOT*, 945 F.3d 515, 527–28 (D.C. Cir. 2019).

The zone of interest test is not "especially demanding." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (internal citations omitted). It asks whether plaintiffs are "intended beneficiaries of the statute at issue" or "suitable challengers—*i.e.*, parties whose interests coincide systemically, not fortuitously with those of intended beneficiaries." *See Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 616 (D.C. Cir. 2019) (cleaned up).

Plaintiffs insist that they fall within the zone of interests of the mining authorization statute for the Superior National Forest, the Federal Land Policy Management Act, the Boundary Waters Canoe Area Wilderness Act, and the National Forest Management Act. *See* Pls.' Reply at 12–14. These statutes preserve the land's resources and aesthetic qualities and protect environmental interests. *See* Superior National Forest, 16 U.S.C. § 508b; the Federal Land Policy and Management Act, 43 U.S.C. § 1701(a)(8); the Boundary Waters Wilderness Act, Pub. L. No. 95-495, 92 Stat. 1649, § 2(4) (1978); the Wilderness Act, 16 U.S.C. § 1133(b); and the National Forest Management Act, 16 U.S.C. § 1604(g)(3). Plaintiffs, businesses and groups that use the land, assert concrete interests that align with these statutes. Pls.' Mot. at 21–24; Pls.' Reply at 12–14. Neither Interior nor Twin Metals contest this. *See* Defs.' Reply 12, ECF No. 72; Intervenor Reply 13–14, ECF No. 71.

Instead, Defendants claim that whether Plaintiffs fall within the zone of interests of these statutes is irrelevant since their Complaints are simply shoehorning a contract claim into an APA action. *See* Defs.' Reply at 12; Intervenor Reply at 14. Citing the D.C. Circuit's opinion in *SEC v. Prudential Securities Inc.*, Twin Metals argues that "a party that lacks standing to press a contract claim cannot avoid that problem by advancing non-contract claims that are 'inextricably

intertwined' with, i.e., 'turn on,' a question of contract interpretation." Intervenor Suppl. Br. 9, ECF No. 78 (citing *SEC v. Prudential Sec.*, 136 F.3d 153, 160 (D.C. Cir. 1998)).

But *Prudential*'s holding was not so expansive. There, the D.C. Circuit held that investors could not sue to enforce terms of an SEC consent decree under a breach of contract theory because the "express language in the consent decree indicate[ed] the parties' intention not to confer standing on third parties to enforce the decree." *Prudential*, 136 F.3d at 154. The court then also concluded that the parties could not prevail on their fraud and unjust enrichment theories because their "common law claims turn on their allegation that Prudential violated the consent decree." *Id.* at 160.

At bottom, the investors' complaint "only [sought] *enforcement* on the basis of the common law claims; there [was] no request for declaratory or similar relief." *Id.* (emphasis added). In other words, under the consent decree, the investors could not seek to enforce the contract terms. Period. It did not matter how they packaged the claim—the decree prohibited them from seeking the remedy of enforcement. If they sought some other remedy—like declaratory relief—the court seemed to acknowledge that those claims may have some merit.

This case differs. Interior and Twin Metals cite cases that prohibit third parties from enforcing contract terms. Very well, but what if Voyageur is seeking some remedy other than enforcement? Here Voyageur is not seeking the specific performance or damages remedies that characterize contract claims. It, in fact, seeks no remedy at all arising from Twin Metals' lease with Interior. Instead, it seeks declaratory and injunctive relief from Interior's final agency action: the reinstatement of the leases. *See* Voyageur Compl. at 36; Wilderness Soc'y Compl. at 22; FOBW Compl. at 38–39.

Since Plaintiffs plead statutory violations under the APA and arguably fall within the zone of interests of those statutes, the Court will not dismiss the Complaints for lack of standing.

**2.**

That said, Voyageur cannot plead APA claims, evade prohibitions on third-party standing, and then, in briefing, morph its claims into contract claims. The APA not only carries a different remedy but also a different standard of review. And it is not plaintiff-friendly. Under the APA, the Court must review agency action to ensure that it is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Unlike how a court would normally analyze a breach of contract case, this standard is "highly deferential, and it presumes the validity of [the] agency action." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007) (cleaned up). But if an agency "failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the Court] must undo its action." *Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) (citation omitted).

So here, the Court must consider whether Interior gave a "reasoned explanation" for reissuing the leases. Since Interior's explanation involved interpreting Twin Metals' lease terms, the Court "will not upset [Interior's] interpretation unless it is an unreasonable one." *Wash. Urban League v. Fed. Energy Regulatory Comm'n*, 886 F.2d 1381, 1386 (3d Cir. 1989); *see also Sw. Bell Tel. Co. v. Brooks Fiber Communs. of Okla., Inc.*, 235 F.3d 493, 499 (10th Cir. 2000) ("We believe the OCC reasonably interpreted the Agreement. . . . Therefore, we find that the OCC's interpretation of the Agreement was neither arbitrary nor capricious.").

Interpreting Twin Metals' lease is no simple task since it is far from the paradigm of a clear, straightforward contract. Twin Metals and Interior executed the leases at issue when

Interior renewed them in 2004.  J.A. 2 at 53–57.  The leases contain a 4-page standard lease renewal form and then append the 1966 original lease agreement.  *Id*.

The standard renewal form consists of generic terms for Interior mining leases with checkbox options to allow for slight customization of the form.  *Id*.  For example, on the first page of the form, the parties could select that they were either renewing a "Sodium, Sulphur, Hardrock" lease or a "Potassium, Phosphate, Gilsonite" lease.  *Id*. at 53.  Since Twin Metals signed a hardrock lease, there is a checkbox next to the only box under "Sodium, Sulphur, Hardrock" leases, indicating that the lease comes "with preferential right in the lessee to renew for successive periods of 10 years[.]" ("10" is inserted into the standard language).  *Id*.

Nowhere on the stamdard form does it explain why the 1966 lease is attached.  Nor does it clarify whether the highly negotiated terms of that contract—particularly those which appear to conflict with some of the standard form's terms—are integrated into or abrogated by the standard form.

The 1966 lease terms are not much clearer.  Key portions of the contract are so convoluted that even a grammarian's head would spin after diagramming a few sentences.  One could imagine a situation in which the parties to the contract had very different interpretations of certain provisions.  But that is not this case.  Here, the parties to the contract—Twin Metals and Interior—agree on the interpretation.  And the Court's only task is to determine whether that interpretation is reasonable.

The Jorjani Opinion's interpretation of the mining leases was, in fact, reasonable.  And its legal conclusions based on that reasonable interpretation were well-founded.

As an initial step, the Court must consider whether the Jorjani Opinion correctly defined the scope of the contract.  The 2004 lease renewal at issue included a four-page standard lease

form and appended the full 12-page 1966 lease. J.A. 1 at 20; J.A. 2 at 53–57. The Tompkins Opinion held that the four-page lease form was the complete expression of the parties' agreement and integrated only two special stipulated terms of the 1966 lease. *Id.* at 44. The Jorjani Opinion retracted that finding. *Id.* at 23. Instead, it concluded that it was unclear what role the appended 1966 lease played in the 2004 lease agreement. *Id.* The four-page form did "not include an integration clause that states that the 2004 lease forms are the complete expression of the parties' agreement." *Id.* at 23 & n.50 (citing *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) ("When a contract lacks an express integration clause [courts] must determine whether the parties intended their agreement to be an integrated contract by reading the writing in light of the surrounding circumstances." (cleaned up)). Therefore, the Jorjani Opinion turned to extrinsic evidence in order to determine whether the terms of the 2004 form or the appended 1966 lease governed.

Extrinsic evidence was particularly relevant to distinguish between apparently contradicting terms in the 2004 lease renewal form and the 1966 lease. For instance, the standard language on the 2004 form states that hardrock leases are "preferential leases," J.A. 2 at 53, whereas, as discussed below, the 1966 lease indicates that Twin Metals has a right to non-discretionary renewals. Voyageur argues that Solicitor Jorjani should not have consulted extrinsic evidence because phrase "preferential lease" has an unambiguous meaning. Pls.' Mot. at 41–44. Not so. Before determining whether the *terms* of the contract are ambiguous, Interior—and this Court—must determine what the contract *is*. Since the scope of the 2004 lease was unclear, the Jorjani Opinion properly turned to extrinsic evidence to determine whether the parties intended the terms on the 2004 form to be the complete expression of their agreement. J.A. 1 at 23.

The Jorjani Opinion also concluded that the actual terms of the 2004 lease form were ambiguous. J.A. 1 at 24. Section 14 on the standard form contained "Special Stipulations." J.A. 2 at 56. These stipulations state that (1) "[t]he terms and conditions of the production royalties remains [*sic*] as stated in the attached original lease agreement," and (2) "[t]he minimum annual production and minimum royalty is $10.00 per acre or a fraction thereof as stated in the attached original lease agreement." *Id*.; J.A. 1 at 23–24.

The problem is, these stipulations do "not precisely state which sections of the 1966 lease are being incorporated." J.A. 1 at 23–24. Royalty terms are "interspersed through the 1966 leases." *Id.* at 24. The Tompkins Opinion assumed that only one section from the 1966 lease was integrated. *Id.* The Jorjani Opinion, on the other hand, acknowledged that "not specifying which of [three possibly applicable] sections were incorporated and how" rendered the 2004 lease ambiguous. *Id.* Solicitor Jorjani thus determined that he must examine both the 1966 lease and other extrinsic evidence to determine which of the 1966 terms continued to govern. *Id*.

This conclusion is reasonable. Recall that the Court is reviewing under the arbitrary and capricious standard. It "need not decide what result [it] would reach if faced with the necessity of construing de novo these Delphic contractual provisions. What is clear only is that it is not clear what these provisions . . . mean." *See W. Union Tel. Co. v. Fed. Commc'ns Com.*, 541 F.2d 346, 352 (3d Cir. 1976). Here, nothing in the 2004 contract contradicts Jorjani's conclusion. There is no explanation for the attached 1966 lease agreement, nor do the stipulations explicitly state what sections of the 1966 lease the 2004 lease integrates. This part of the opinion is well-reasoned and well-supported. *See* J.A. 1 at 23–24. The Court will therefore not disturb it.

Since the Jorjani Opinion reasonably determined the 2004 lease terms were ambiguous and that it was not a fully integrated contract, it permissibly consulted extrinsic evidence to

determine the parties' intent. *Id*. at 24; *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018) ("[W]hen a contract is ambiguous, courts can consult extrinsic evidence to determine the parties' intentions."). First, it considered the 1989 "decision file" from when Interior renewed the lease for the first time. J.A. 1 at 24–25. Originally, Interior issued a decision in 1988 that would have changed the lease terms from the 1966 agreement. J.A. 1 at 24; J.A. 2 at 89. But Interior quickly vacated its decision. J.A. 2 at 86; J.A. 1 at 24–25. The Assistant Director Manager for Solid Minerals at BLM reviewed the lease and, "[b]ecause of the highly negotiated terms and conditions of [the] leases, which contain many references to requirements to be applied during lease renewal periods," he recommended the "leases be renewed under the existing terms and conditions and in their present form, i.e., not on the new leased form." J.A. 2 at 88; J.A. 1 at 24–25. BLM thus renewed the leases under the existing terms of the original leases. J.A. 2 at 86, 88; J.A. 1 at 25. Using its standard renewal form—identical to the 2004 form at issue—and attaching the 1966 leases, BLM and Twin Metals executed the lease renewal. J.A. 2 70–73; J.A. 1 at 25.

Next, the Jorjani Opinion examined the circumstances surrounding Twin Metals' 2004 renewal application. J.A. 1 at 25. There, Jorjani observed that there was "no statement or other indication in the files that the BLM or the company intended to change any terms of the 1989 leases." *Id.* at 25. Jorjani thus concluded that "[t]he 2004 renewal could, and did . . . renew the leases under the same terms as in 1989, thereby retaining the renewal terms of the 1966 leases." *Id*. at 26.

Again, the Court believes that this conclusion, based on the extrinsic evidence, is well-supported and reasonable. Indeed, Voyageur does not dispute that the 2004 leases were renewed

under the same terms as the 1989 leases.[9] Instead, it argues that the plain language of the 1966 leases and extrinsic evidence shows that "the 1966 leases did not guarantee renewal unless the lessee started production during the primary 20-year term." Pls.' Mot. at 48. Here too, though, the Jorjani Opinion reaches a reasonable conclusion.

Does Twin Metals' 1966 lease provide Twin Metals with a non-discretionary right to third renewal? The Jorjani Opinion says "yes." For this, it looks to Section 1 of the 1966 lease, which provides "a right in the Lessee to renew the same for successive periods of ten (10) years each in accordance with regulation 43 C.F.R. § 3221.4(f) and the provisions of this lease." J.A. 2 at 102; J.A. 1 at 27. The regulation cited in Section 1 includes a substantially similar condition, providing lessees with "[a] right of renewal for successive periods, not exceeding 10 years each, under such reasonable terms and conditions as the Secretary of the Interior may prescribe[.]" 43 C.F.R. § 3221.4(f) (1966).

The Jorjani Opinion concludes that "[S]ection 1 of the 1966 leases, by its own terms and by reference to section 3221.4(f) of the regulations, establishes that the lessee has a right of renewal for successive ten-year periods, and that the renewals are subject to the provisions of the lease, including provisions regarding subsequent terms and conditions." J.A. 1 at 27. According to the Jorjani Opinion, "[n]o other provision of the leases negates this right of renewal." *Id.*

Voyageur disagrees. In its view, Section 5 of the 1966 lease constricts the rights in Section 1. Pls.' Mot. at 49. Section 5, in relevant part, provides:

> The Lessor [BLM] shall have the right to [1] reasonably readjust and fix royalties payable hereunder at the end of the primary term of this lease and thereafter at the end of each successive renewal thereof unless otherwise provided by the law at the

[9] Voyageur protests that the 1989 extrinsic evidence points toward Interior providing Twin Metals with a "preferential lease" rather than a lease entitled to non-discretionary renewal terms. Pls.' Mot. at 55. Though Voyageur's argument is plausible, it does not displace the Jorjani Opinion's reasonable alternative conclusion that the extrinsic evidence shows that the leases were renewed "under the existing [1966] terms and conditions." J.A. 2 at 88; J.A. 1 at 24–25.

time of the expiration of any such period, and [2] to readjust other terms and conditions of the lease, including the revision of or imposition of stipulations for the protection of the surface of the land as may be required by the agency having jurisdiction thereover;

provided, however, that the Lessee [now Twin Metals] shall have the right to three successive ten-year renewals of this lease with any readjustment in the royalties payable hereunder limited to that hereinafter provided and with no readjustment of any of the other terms and conditions of this lease *unless at the end of the primary term of this lease the Lessee shall not have begun production*, either hereunder or under the companion lease granted to the Lessee this day.

J.A. 2 at 109 (emphasis added).

Voyageur interprets this section to mean that Twin Metals is only entitled to a third right of renewal *if* it begins production during the initial 20-year term. Pls.' Mot. at 49. Otherwise, the renewal term is discretionary. *Id*. It reaches this conclusion by reasoning that the "unless" phrase modifies the clauses (1) "Lessee shall have the right to three successive ten-year renewals of this lease"; and (2) "with any readjustment in the royalties payable hereunder limited to that hereinafter provided[.]" Pls.' Mot. at 50. In other words, one could read Section 5 to say, Twin Metals "shall have the right to three successive ten-year renewals of this lease, unless at the end of the primary term of this lease the Lessee shall not have begun production." The Tompkins Opinion reached the same conclusion. J.A. 1 at 48.

But Voyageur provides no compelling reason for cutting out the middle part of that sentence or for explaining why the "right to three successive ten-year renewals of this lease" is a separate phrase from "with any readjustment in the royalties payable hereunder limited." *But see* Intervenor Mot. at 59. Instead, it appears to the Court—as it did to Jorjani—that "with any readjustment in the royalties payable hereunder limited" modifies the right to renewal. J.A. 1 at 29. In other words, Section 5, properly read, states on its face that Twin Metals was entitled to three ten-year renewals without adjusted royalties or terms of conditions if it began production

within the initial lease term. *Id.* If it failed to begin production, its renewal terms were subject to changed terms and royalty rates. But nothing in Section 5 states that Twin Metals loses all rights to renewal.

The Court believes this is the correct interpretation of the plain language of Section 5. But, admittedly, this section is no model of clarity. In any event, it was certainly not arbitrary and capricious for Interior to interpret Section 5 as imposing limits on the terms and conditions of right of renewal, not striking the right altogether. *See W. Union Tel. Co.*, 541 F.2d at 352.

Since Sections 1 and 5 are unambiguous, there is no need to turn to extrinsic evidence to determine the intent of the parties. *CNH Indus. N.V. v. Reese*, 138 S. Ct. at 766 ("When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." (internal citations omitted)). The Court, then, need not consider Voyageur's argument that evidence from the 1966 lease negotiations and the 1989 renewal application bolster its interpretation of Section 5. *See* Pls.' Mot. at 51–58. That said, the Jorjani Opinion addressed this extrinsic evidence and convincingly explained why these sources do not undercut its interpretation of Sections 1 and 5. J.A. 1 at 30–32. Under the APA, that reasonable explanation will be affirmed by this Court. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (noting that a court will uphold an agency's decision if the agency provides "a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (cleaned up)).

In a last-ditch effort, Voyageur tries to invoke the "unmistakability doctrine" to argue that the Jorjani Opinion's reasoning is unsound. Pls.' Mot at 44–47. This doctrine is a "rule of construction . . . that one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a

right in unmistakable terms." *W. Fuels-Utah, Inc. v. Lujan*, 895 F.2d 780, 789 (D.C. Cir. 1990). Voyageur suggests that under this doctrine, the Court must interpret the lease terms to favor Interior retaining discretion over lease renewals. Pls.' Mot. at 44.

But, as Interior and Twin Metals observe, this argument suffers from two flaws. First, Voyageur cites *no* cases suggesting a private third party can use this doctrine as a sword against the Government's interpretation of its own contract. Defs.' Mot. at 49. Second, it is unclear what relevance this doctrine has here. Intervenor Mot. at 51. The doctrine generally applies when there is a dispute between the Government and a private party about the effect of future changes in law on a contract's terms. *See Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 618 (D.C. Cir. 1992*), abrogated in part on other grounds as recognized in Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Voyageur, here, tries to invoke the doctrine not only as a third party but also when there is no question about the effect of "future changes in the law" on the contract terms. The Court cannot endorse Voyageur's attempt to leverage this doctrine.

## IV.

"To err is both human and inevitable in a large agency such as the [Department of the Interior]." *Howard Sober*, 628 F.2d at 42. Here, Interior timely corrected an error that would have deprived Twin Metals of its right to valuable leases. Its analysis explaining the need to correct this error was thorough, thoughtful, and reasonable—a far cry from "arbitrary and capricious." The Court will therefore grant Interior's and Twin Metals' Motions for Summary Judgment, deny Voyageur's Motion for Summary Judgment, and deny Twin Metals' Motion to Dismiss.

A separate Order will issue.


_____
Dated:  March 17, 2020                              TREVOR N. McFADDEN, U.S.D.J.